Lawrence D. **CONKLIN**

v.

Parker L. **HANCOCK**, Warden, New Hampshire State Prison.

Civ. A. No. 3447.

United States District Court,
D. New Hampshire.

Dec. 3, 1971.

Lawrence D. Conklin, pro se.

Robert V. Johnson, III, Asst. Atty. Gen., State of New Hampshire, for defendant.

## OPINION AND ORDERS

BOWNES, District Judge.

Petitioner in this Civil Rights action is being held in a New Hampshire State Prison pending trial on a charge of first degree murder of a guard at the Rockingham County Jail. He was at the Rockingham County Jail awaiting trial on a firearms charge and, after the alleged murder, was transferred to the New Hampshire State Prison in Concord for security reasons.

Plaintiff's pro se complaint alleges deprivation of his constitutional rights. He specifically charges that he is being denied the equal protection of the law

which other inmates receive and that he is being discriminated against because he is being held in solitary confinement. Plaintiff further alleges that his treatment constitutes cruel and unusual punishment forbidden by the Eighth Amendment. Other allegations are: the denial and curtailment of mail privileges, the denial of church attendance, the denial of fresh air exercise, the denial of library privileges, the denial of television viewing, and interference with and denial of conferences with his attorney and possible witnesses at his trial, who are also inmates, and complaints about the quality and quantity of the food.

By order of this court dated October 21, 1971, petitioner's letter stating his grievances was construed as a petition pursuant to 28 U.S.C. § 1343, and 42 U.S.C. § 1983.

A hearing on the petition was held on November 19, 1971. The petitioner testified to the following effect. He is locked in a cell continuously except for brief periods of exercise, not exceeding thirty minutes a day, in a corridor in front of his cell. He has a red tag on the door of his cell which means that he is being held in solitary confinement and cannot talk to any other inmates. He is given clean clothes and a shower only once a week while the other inmates are allowed to shower every day. His confinement to a cell means that he is denied vocational rehabilitation, participation in any sports program, and any contact with the other inmates. He has been prevented from conferring with his attorney and with other inmates who might be witnesses at his trial. Copies of requests to the Warden which were denied were received in evidence. (Pl. Ex. D). Those requests were for an exercise period, use of a typewriter, use of a television set, full mail privileges, treatment as an ordinary inmate, attendance at church, permission to talk to other inmates, a light in his cell for reading, school attendance, and document notorization. Four letters were received in evidence which petitioner claims were not mailed. They are: a letter to a professor of pharmacology, concerning a possible defense to the charges against petitioner (Pl. Ex. A); a letter to this court concerning the subject matter of the instant case (Pl. Ex. B); a letter to a newspaper reporter concerning the crime allegedly committed by petitioner (Pl. Ex. C); and a letter to the Governor of New Hampshire criticizing the Warden (Deft. Ex. I). Plaintiff also testified that letters to his attorney were not mailed.

On cross-examination petitioner stated that he does not contest the validity of his pretrial detention, that he does not seek a writ of habeas corpus, and is not seeking damages from the defendant. But he does complain about the conditions under which he must live while waiting trial. He admitted that he has a criminal record, that he has participated in escape attempts from other prisons, that he has been an uncooperative prisoner in the past, and that he once assaulted a prison officer. His F. B. I. "rap sheet" and progress reports from the United States penitentiaries to which he had been confined make it clear that the petitioner has reacted violently in the past to confinement. In fact, the present murder charge against him is alleged to have resulted from an attempt to escape from the Rockingham County Jail. Based upon his past record, it is not unfair to characterize the petitioner as a high security risk.[1]

Mr. Dowd, Deputy Warden and Chief Custodial Officer of the State Prison, testified on behalf of the defendant. He stated that petitioner's classification and progress reports from the Federal Bureau of Prisons show conclusively that petitioner is a very bad custodial risk since he has an adverse psychological evaluation and has been involved in prior escape attempts from other institutions. He stated that the pending charge

---

1. There is attached, hereto, an Appendix containing excerpts of the petitioner's prison records.

against a prisoner is given very little consideration in determining the manner and conditions of confinement. While this may generally be true, I cannot believe that the present charges against the petitioner are not a factor in the conditions of his confinement.

Dowd explained the color tagging system. An ordinary inmate has a small white tag outside of his cell, a prisoner who is idle for medical reasons has a green tag, and the red tag is used for serious cases. The red tag means that a guard cannot open the prisoner's cell door without the Warden's permission, and it amounts to punishment in that red tagged prisoners are isolated from the general prison population and cannot communicate with them. Dowd admitted that the petitioner has not violated any prison rules, but was red tagged because of his past record and his attitude.

Dowd also testified as to the prison mail regulations. Inmates are allowed to write only to their immediate families without permission. All other letters are restricted to those on an approved list. Letters to the Governor, Governor's Council, the courts, prison trustees, and attorneys are not censored and do not require special permission. All other mail is usually censored. The letter to the professor of pharmacology and the letter to the newspaper reporter were not sent because the addressees were not on the approved list. He did not know why the letter to this court was not sent and stated that he had never seen it.

Dowd testified on cross-examination that the petitioner does not get an outdoor fresh air period for security reasons, stating: "It is my best judgment that you should be exercised as you are being exercised." The petitioner is given an opportunity to exercise each day outside of his cell for about thirty minutes. A detailed breakdown of petitioner's exercise periods was admitted in evidence showing that he has refused to take advantage of his exercise period on eighteen occasions. The Deputy Warden denied that the petitioner was prevented from conferring with his attorney privately. He admitted that the petitioner was being held in what amounts to solitary confinement, that he is fed in his cell, and that he is allowed a bath only once a week.

The essential facts are not in dispute. The issue is whether the conditions of petitioner's confinement result in "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . .." 42 U.S.C. § 1983.

### RULINGS

### I. CONDITIONS OF CONFINEMENT

Petitioner is a pretrial detainee and not a convict. Under the Constitution, he is presumed to be innocent of the pending and untried criminal charges against him. He cannot be subject to any punishment, let alone cruel and unusual punishment. Jones v. Wittenberg, 323 F.Supp. 93 (N.D.Ohio 1971); Tyler v. Ciccone, 299 F.Supp. 684 (W.D.Mo. 1969).

The constitutional rights of the petitioner, however, must be judged against the background of his record and the fact that the state has a right to confine him pending trial.[2] I cannot, therefore, fault the decision of the prison officials that petitioner's release to the general prison population would result in a serious risk to prison discipline and security. In making this decision, the prison officials had the right and the duty to consider not only the petitioner's record but the circumstances of the crime with which he is now charged. Because of his status as a pretrial detainee, however, the conditions of his isolation have to be as humane as possible and limited only by the threat he presents as a security risk. The petitioner should be allowed all of the priv-

---

2. N.H.Rev.Stat.Ann., Ch. 597:1, provides:
   *When Allowed.* Except for capital offenses where the proof is evident or the presumption is great, all persons arrested for crime shall, before conviction, be released on personal recognizance or be bailable by sufficient sureties, whichever justice may require.

ileges of other prisoners except those that involve mixing with the general prison population. Specifically, the petitioner must be allowed to have a shower daily if that is the custom as to other prisoners, even if it entails close supervision by a prison guard. He must be allowed a daily fresh air exercise period of at least one hour and not just a chance to exercise in the corridor outside his cell. If weather conditions do not permit outside exercise, then he is to be allowed a minimum of at least one hour's indoor exercise a day. If the other prisoners are allowed a reading light in their cells, a reading light must be provided the petitioner. If a television or radio set is allowed the other prisoners, so also the petitioner has a right to the same. The petitioner is entitled to have reading materials from the library provided to him. The food that he receives must be equal in quantity and quality to that given other prisoners. The petitioner is now allowed to attend church, and this privilege shall be continued. Deputy Warden Dowd stated that he has always been allowed to confer privately with his attorney and this right shall be continued. The prisoner's attorney must be allowed to confer privately with any inmates of the prison who may be possible witnesses for the petitioner in his pending trial, and if his attorney thinks it is necessary, the petitioner must be allowed to be present at such conferences. In short, the petitioner is entitled to receive the same treatment as any other inmate except the right to be released to the general prison population. I realize that this will impose additional burdens on the prison staff, but the petitioner's constitutional rights are more important than institutional considerations.

## II. MAIL PRIVILEGES

### A. Outgoing Mail

■ Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971), held, without deciding whether a prisoner retains all First Amendment rights, that a prisoner may send letters to the press concerning prison matters, including "prison management, treatment of offenders, and personal grievances arising within the prison." Not included are "matters of public policy or personal affairs unrelated to the prison." Even if petitioner's letter to the newspaper reporter (Pl. Ex. C) falls within the latter classification, he is permitted to send it since he has not been convicted of any crime and, in fact, may send mail to any person. Tyler v. Ciccone, *supra*.

Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I.1970), held that pretrial detainees could send uncensored mail to any person as a First Amendment right. The court recognized that First Amendment rights are subject to the "clear and present danger" test of Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919), and that:

> In each case [courts] must ask whether the gravity of the "evil," discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger. [Adopting the standard articulated by Judge Hand in United States v. Dennis, 183 F.2d 201, 212 (2nd Cir. 1950).] Dennis v. United States, 341 U.S. 494, 510, 71 S.Ct. 857, 868, 95 L.Ed. 1137 (1951).

The obvious evil here is that petitioner may try to enlist the aid of outsiders in an escape attempt. The only way of screening such a plan is to permit censorship of outgoing mail. I hold, therefore, that outgoing mail to addressees other than public officials and petitioner's attorney of record may be read for the purpose of determining whether or not escape plans are being made. This does not mean that letters may be held up because they are critical of the prison administration, since critical or even insulting letters would not present a clear and present danger to prison security. I do not decide the question of whether outgoing mail from pretrial detainees who have no past record of escape attempts may be censored, since that question is not before me. In *Palmigiano* there was no indication that any of the petitioners had records that would

make it reasonable to determine that the detainee was a high security risk.

### B. *Incoming Mail*

█ Incoming mail to the petitioner from public officials and his attorney of record must be delivered promptly and unopened. Even if petitioner were a convicted prisoner, censorship of any mail to or from his attorney would probably inhibit the Sixth Amendment guarantee of effective assistance of counsel and, therefore, be prohibited. Palmigiano v. Travisono, *supra*. See Tyree v. Fitzpatrick, 445 F.2d 627 (1st Cir. 1971), suggesting that a Federal Court may order mail from attorneys of record to be delivered unopened if the inmate can show irreparable injury so as to warrant injunctive relief. In this case, since the attorney is a reputable member of the New Hampshire Bar, it must be assumed that any incoming mail has to do with the conduct of the trial.

Incoming mail from other sources may be inspected for drugs or other contraband, and may be read to the extent necessary to determine if there are any escape plans and to screen inflammatory writing or pornography. Palmigiano v. Travisono, *supra*.

In summary, the petitioner has a right to send and receive letters without restrictions, subject to the censorship outlined herein.

So ordered.

### APPENDIX

*Excerpts From The Petitioner's Prison Records At United States Penitentiary, Lewisburg, Pennsylvania*

*Psychiatric Appraisal, October 6, 1955:*

He was involved in serious unprovoked physical assaults upon inmates at Chillicothe, has no repentance for such acts, and repeated today that he is capable "of smashing someone with a shovel on his detail, or killing an officer." It is my impression that Conklin is a dangerous individual capable of any violence, a definite menace to society.

*Special Progress Report, 10–8–56:*

After entering the cell he refused to remove his clothing for the search required of all inmates going into punitive segregation. Lt. Tucker began removing Conklin's clothing from him at which time he swung at Lt. Tucker hitting him in the mouth and inflicting rather serious injuries. . . . Several other officers who subsequently entered the cell were struck by Conklin in the scuffle.

Incidents such as those mentioned above occur frequently and there is seldom a day that Conklin does not threaten to do bodily harm to someone in the institution.

*Psychological Evaluation, 4–23–57:*

There is no evidence of an active psychiatric disorder. Basically he appears to be a Sociopathic Personality, Antisocial Reaction, manifested by marked emotional immaturity, lack of sense of responsibility, poor judgment and an ability to rationalize his behavior.

*Special Progress Report, April 23, 1957:*

At such times as Conklin remained in the population at Lewisburg he earned the reputation as a strong-arm artist through his activities of pressuring and strong-arming other inmates for commissary items.

*Case Analysis, 5–21–59:*

He is assaultive, refuses to obey orders or follow regulations, associates with undesirable individuals, and is a troublemaker.

At first, he was held in the Cumberland County Jail, Portland, Maine, but his conduct became so bad, he caused one disturbance after another and came near to inciting a riot in the jail, that he was moved to Kennebec County Jail, Augusta, Maine, November 26, 1958, where he was held in iso-

lation and guard duty was continued around the clock.

He is anti-social and has made no attempt to adjust or cooperate either in free society or confinement. He is a dangerous, assaultive type of individual, requiring extreme caution, care, and supervision.