Leo F. FEELEY, IV, et al.,
Plaintiffs, Appellees,

v.

George SAMPSON, etc., et al.,
Defendants, Appellants.

No. 76–1508.

United States Court of Appeals,
First Circuit.

Argued April 4, 1977.

Decided Jan. 18, 1978.

Carleton Eldredge Stratham, N. H., for defendants, appellants.

Douglass P. Hill, Portsmouth, N. H., with whom Robert D. Gross, Manchester, N. H., was on brief, for plaintiffs, appellees.

Before COFFIN, Chief Judge, MARKEY, Chief Judge,* CAMPBELL, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Having recently considered questions regarding the constitutional rights of sentenced prisoners,[1] we now confront questions relative to the status of unconvicted persons ("detainees") awaiting trial. This appeal by New Hampshire county officials is from a judgment of the district court ordering changes in the conditions under which detainees are confined at the Rockingham County Jail (the Jail). The changes are intended to bring the conditions under which this category of prisoners is confined into conformity with the Constitution. The Jail, an elderly structure, was transformed in 1961 from a house of correction to its present status. As well as detainees awaiting trial, it houses men serving short misdemeanor sentences. The present class action under 42 U.S.C. § 1983 was brought by a detainee who later, upon conviction, went on to serve his sentence in the New Hampshire State Prison. He has been joined as

* Of the United States Court of Customs and Patent Appeals, sitting by designation.

1. *See Nadeau v. Helgemoe*, 561 F.2d 411 (1st Cir. 1977).

plaintiff by other detainees, and after discovery proceedings and in response to plaintiffs' motion for partial summary judgment the district court entered the order appealed from.

## I

Some of the facts that were before the district court concerning the condition of detainees at the Jail are as follows: In 1975 the average length of a detainee's stay in the Jail was only about seven days. However, a stay of from three to four months was not uncommon and a few detainees were there for as long as eight or nine months. Detainees made up some 20–40 per cent of the population, which on the average totalled about fifty. Prior to the district court's intervention, the detainees were relegated to fourteen cells in the third tier, often two to a cell.

The detainees consist of persons accused of unbailable offenses, such as first degree murder, and those unable either to make bail or to qualify for release on recognizance.[2] Although presumptively innocent of the crimes for which they are being held for trial, detainees are almost invariably charged with misconduct far more serious than the minor misdemeanors for which convicted offenders are serving time in the Jail. Thus they may pose security problems, on one recent occasion having murdered a guard and more regularly engaging in incidents such as fights, arson, and the like "every couple of days" (Deposition of Sheriff Sampson). Detainees with drug or alcohol problems, only recently having been removed from the outside, are said to present special problems. Because the convicted misdemeanants work outside during the day, apparently with rather minimal security arrangements, contraband is easily smuggled to detainees inside the facility.

The detainees' cells are small (7' × 5' × 6½') and contain a sink-toilet combination, two bunk beds, mattresses, sheets, pillows, blankets, a single shelf and a protected light bulb. The third tier cells face windows some 8½ feet away, across the tier. When suit was brought, detainees were allowed out during the day only on the 36' × 4' walkway adjoining their cells. They were not allowed to use the Jail's day room with television, radio, games, ping-pong table and "library" (apparently 75 assorted books left behind by inmates), nor to use other recreational equipment, or participate in work programs. Their meals were served in the cells or on the tier, although the sentenced inmates ate in a dining room. Detainees were permitted three showers a week while those sentenced to the Jail could shower at any reasonable time.

Visits took place in a portion of the first floor which was partitioned by a thinly meshed steel screen with benches on both sides. Inmates and their visitors could not touch one another. Conversations were, however, not monitored. There were no private facilities for consultations between attorney and client.

A detainee had to sign a statement consenting to the censorship of his mail; if he refused, all mail was withheld from him. Incoming mail, except lawyer's legal correspondence and letters to the media and public officials, was opened and scanned. Books, magazines and newspapers were censored for content. Outgoing mail, except legal correspondence and letters to the media and public officials, was opened and scanned.

It was the custom of the Jail without any notice or hearing whatever to transfer inmates who acted up to "discipline" cells on the first tier or to the "safe-keeping" cell located in a tunnel connecting the Jail with another building. Confinement continued until "the problem conduct abate[d]."

---

**2.** Under New Hampshire law, only first degree murder and offenses punishable by death are non-bailable crimes. NH RSA 597:1. Release on personal recognizance is required in misdemeanors and is available in felonies if the individual is deemed to be not a risk to himself or others and likely to appear. NH RSA 597:6–a. Since August of 1975, any person charged with an offense may appeal from the local courts to the Superior Court for a reduction in bail or for release on personal recognizance. NH RSA 597:6–b.

The Jail was administered virtually without written or oral rules. Correctional officers were told to use commonsense in disciplining. Decisions about who could visit and what mail would be censored were left up to the individual officers.

## II

The district court summarized the issues before it as follows:

1. May defendants subject pretrial detainees to harsher conditions of confinement than those imposed upon sentenced prisoners;

2. Must defendants alter their visitation practices;

3. Must defendants provide plaintiffs greater access to telephones;

4. Must defendants alter their mail censorship practices;

5. Must defendants permit plaintiffs to possess various items of personal property;

6. Must defendants promulgate and distribute written, objective and reasonable rules governing the operation of the jail and delineating the rights and responsibilities of inmates;

7. Must defendants adopt certain disciplinary procedures;

8. Must defendants alter their practices concerning transfers of pretrial detainees to the New Hampshire State Prison.

Before addressing each of these questions, the court undertook to set out the principles it would apply. It said that detainees are "presumptively innocent individuals" and that they therefore "retain all the rights of free citizens" except that their mobility is necessarily curtailed and they must be subject to certain limitations to protect institutional security. The court felt that under the equal protection clause "any distinction between those detained and those free on bond must be based solely upon the precautions the state must take to assure the appearance of the accused at trial". Moreover, treatment of the detainees had to be equal to or less onerous than that accorded convicted offenders, "other-

wise, the incarceration becomes punishment in violation of the Due Process Clause of the Fourteenth Amendment". In conclusion the court stated that "[t]he conditions of pretrial confinement must be the least restrictive means of achieving the state's sole legitimate end, the presence of the accused at trial," and that all restrictions, to be constitutional, had to be justified by "compelling necessity".

The court then applied these principles to the different grievances, ordering extensive relief. Only some of these remedial rulings, altering and improving conditions at the Jail, have been appealed. Officials have accepted the court's order that detainees be lodged in single cells and be permitted access to the same exercise and recreational facilities as sentenced prisoners; they have accepted some but not all modifications of visitation and mail censorship practices; they have accepted the court's order that written rules and regulations be promulgated setting forth the detainees' rights and obligations and the procedures for infractions; and they have accepted certain aspects of court-ordered disciplinary procedures. We need consider only those orders, described below, from which an appeal was taken. Before turning to the specific exceptions, we shall consider generally what constitutional constraints the fourteenth amendment imposes upon state and local authorities in the treatment of unconvicted detainees.

## III

■ At common law pretrial detainees were differentiated from sentenced prisoners. Blackstone said that

"imprisonment [of those awaiting trial], as has been said, is only for safe custody, and not for punishment: therefore, in this dubious interval between the commitment and trial, a prisoner ought to be used with the utmost humanity, and neither be loaded with needless fetters, nor subjected to other hardships than such as are absolutely requisite for the purpose of confinement only . . . ."

4 W. Blackstone, Commentaries *300. In prohibiting excessive bail, the eighth amendment both limits pretrial confinement to situations where presence at trial cannot be safely assured by means other than confinement, *see Stack v. Boyle,* 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951), and tacitly indicates the Founders' acceptance of the practice of pretrial confinement in such special cases.

While the Supreme Court has not yet discussed the status of detainees, there is general agreement among at least the four federal circuit courts that have ruled that the states may constitutionally deprive detainees of liberty only to the extent necessary to ensure their presence at trial.[3] *Duran v. Elrod,* 542 F.2d 998 (7th Cir. 1976); *United States ex rel. Tyrrell v. Speaker,* 535 F.2d 823, 827 (3d Cir. 1976); *Rhem v. Malcolm,* 507 F.2d 333, 336 (2d Cir. 1974); *Anderson v. Nosser,* 456 F.2d 835, 837–38 (5th Cir. 1972) (en banc) (modifying 438 F.2d 183 (5th Cir. 1971)), *cert. denied,* 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972).

These decisions reflect a strong consensus that restrictions designed only to serve some function irrelevant, or more burdensome than necessary, to secure the detainee's presence at trial are constitutionally impermissible. However, as the maintenance of institutional security "directly serves" the state's interest in ensuring the detainee's presence, jail order and security has been accepted as a consideration entitled to great weight when balancing the state's interest against the liberty interest of detainees. *Main Road v. Aytch,* 565 F.2d 54 (3d Cir. 1977); *Smith v. Shimp,* 562 F.2d 423 (7th Cir. 1977).

Apart from more specific guarantees such as the first amendment, the constitutional provision most commonly, and we think accurately, cited as protecting detainees is the due process clause of the fourteenth amendment. *See: e. g., Duran v. Elrod, supra.* In an analogous context, the Supreme Court has said, "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). *See McNeil v. Director, Patuxent Institution,* 407 U.S. 245, 249–50, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972). *Compare O'Connor v. Donaldson,* 422 U.S. 563, 573–75, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Restrictions or conditions of confinement that are without reasonable relation to the state's purpose in confining a detainee—his production at trial—violate due process.[4]

**3.** A further valid reason for pre-trial detention in some instances might possibly be to protect the public against a dangerous individual, but as this ground would not alter the analysis or the outcome in cases like the present, there is no need to pursue it.

**4.** Pretrial confinement is not, however, a species of illegal or improper confinement, lacking in due process. The lower court seems, to some degree, to have so believed in insisting that pretrial confinees had to be extended rights comparable to those on bail. The eighth amendment by necessary implication contemplates the use of pretrial confinement in appropriate cases. A detainee will have received due process in the form of some kind of probable cause determination and a bail hearing; and he has the right to a speedy trial. *See Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Smith v. Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969); *cf. Ierardi v. Gunter,* 528 F.2d 929 (1st Cir. 1976); *Greci v. Birknes,* 527 F.2d 956 (1st Cir. 1976) (due process requirements for detention pursuant to ex-

tradition). While a detainee is presumptively innocent, this status does not require his jailers to act as if he were not a security risk. As the Third Circuit has put it,

"We note that some courts have apparently relied upon the 'presumption of innocence' in cases involving pretrial detainees. However, we do not believe that principle serves as the source for those substantive rights. Rather, the presumption allocates the burden of proof. It is a principle of evidence, . . acting as the foundation for the procedural due process requirement of proof beyond a reasonable doubt. . . . . If the 'presumption of innocence' is read literally to apply to all pretrial procedures, it is impossible to justify bail or pretrial detention, both of which are imposed upon the accused despite the presumption."

*Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1080 n. 1 (3d Cir. 1976) [citations omitted].

█ In the absence of further guidance from the Supreme Court it is less clear that, aside from specific guarantees such as the first amendment, other constitutional provisions apply. The Second Circuit has held that the eighth amendment does not apply to pretrial detainees because they are not being published. *See Johnson v. Glick,* 481 F.2d 1028, 1032 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973); *cf. Anderson v. Nosser, supra. See also Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). Several district courts have reached a different result, *see e. g., Johnson v. Lark,* 365 F.Supp. 289, 302 (E.D.Mo.1973); *Collins v. Schoonfield,* 344 F.Supp. 257, 264–65 (D.Md.1972); *Jones v. Wittenberg,* 323 F.Supp. 93, 99–100 (N.D.Ohio 1971), *aff'd,* 456 F.2d 854 (6th Cir. 1972). *See also Anderson v. Nosser supra,* 456 F.2d at 842 (Tuttle, J., dissenting). Like the Seventh Circuit we believe that whether or not the eighth amendment is directly applicable, precedent under the eighth amendment is relevant and persuasive in detainee cases, *Duran v. Elrod, supra,* 542 F.2d at 999–1000. The due process clause requires a state to play its limited custodial role in a reasonable, and hence a humane, manner. It is impossible to conceive of situations where treatment so cruel or barbaric as to violate the eighth amendment if visited upon a sentenced prisoner would satisfy a detainee's due process rights. Loading a detainee with chains and placing him in a dungeon might, it is true, further the state's interest in ensuring his presence at trial; but as it is obvious that in virtually all cases this purpose could be promoted without such harsh measures, resort to them would ordinarily violate due process.

While the eighth amendment—whether or not directly applicable—provides a relevant standard, the role of the equal protection clause in detainee cases is more questionable. Classifications by the state must have a rational basis, and to that extent the equal protection clause may be said to fortify a detainee's right, already protected under the due process clause, to be treated in a manner rationally related to the limited purpose for which he is imprisoned. But this concept of equal protection adds little if anything to the due process analysis. Those district courts, including the court below, that have engaged in equal protection analysis have usually adopted a "strict scrutiny" approach, under which a state carries a burden of justifying every restriction imposed upon an inmate on the basis of "compelling interest", and must further demonstrate that each measure taken is the "least restrictive alternative". The court below erroneously construed our decision in *Inmates of Suffolk County Jail v. Eisenstadt,* 494 F.2d 1196 (1st Cir.), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974), as endorsing this form of analysis. Without questioning the correctness of the district court's ultimate judgments in *Eisenstadt,* 360 F.Supp. 676 (D.Mass.1973), we observe that the appeal in that case was limited to issues entirely unrelated to the matter of strict scrutiny. This court accordingly never had occasion to pass on the question.

As we indicated in *Nadeau v. Helgemoe,* 561 F.2d 411 (1st Cir. 1977), strict scrutiny has not found favor in the Supreme Court's prisoner cases; and while the state's control over detainees is for a more limited purpose than that over convicts, we are unpersuaded that this approach is viable even as to detainees. The Court has said that strict scrutiny of legislative classifications is appropriate only when "the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Mass. Board of Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) [footnote omitted]. Detainees are not a suspect class, and while confinement restricts liberty, a basic right, the Court has yet to suggest, in any way, that the dialectic between confinement and liberty triggers strict scrutiny analysis. *Id.* at n. 3. In prisoner cases involving first amendment rights—where it is most clear that even sentenced prisoners retain important constitutional protections—the Court has declined to shift the burden of justification wholly to

the state. Rather, in *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), the Court described the appropriate posture of judicial review:

> "Without a showing that these beliefs [in danger to security] were unreasonable, it was error for the District Court to conclude that [the officials] needed to show more. In particular, the burden was not on [the officials] to show affirmatively that the Union would be 'detrimental to proper penological objectives' or would constitute a 'present danger to security and order.' . . . Rather '[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'"

*Id.* at 127–28, 97 S.Ct. at 2539, *quoting Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). *See also Bounds v. Smith,* 430 U.S. 817, 832–33, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

■ While detainees are not convicts, the same practical reasons that counsel judicial restraint in second-guessing correctional officials dictates restraint in second-guessing the authorities who run jails. *See Main Road v. Aytch, supra,* 565 F.2d at 57. We believe that the proper standard by which to review the actions of those lawfully entrusted with the custody of detainees is that normally employed in reviewing administrative actions: whether the actions of jail authorities are arbitrary or capricious; whether they are lacking in a reasonable relationship to the limited purpose of the confinement; and whether they are otherwise not in accordance with law.

Strict scrutiny review would have the far-reaching effect of substituting "the values and judgment of a court for the values and judgment of the legislature and prison administration". *Nadeau v. Helgemoe, supra,* 561 F.2d at 417. Who is to say what is the "least restrictive alternative" within the

means of the state? Who is to say what security precautions are "compelled" rather than merely prudent? We do not think that the Constitution requires, or indeed that it would be feasible or desirable, for judges to make decisions as to all the details of jail life, overriding the judgments, if reasonable, of both legislators and jail authorities.

■ The court below adopted as a yardstick for measuring detainees' rights, a presumptive rule that it is unconstitutional to treat a detainee less well in any particular than a sentenced inmate. But while the treatment of other prisoners is relevant to whether or not a detainee is being treated with unnecessary restrictiveness, it is not conclusive. Facilities for short-term jail prisoners need not be as comprehensive in all respects as those provided for one serving a term of years. A detainee with a notorious record as a bank robber may not be entitled to as lenient security conditions as someone serving a misdemeanor sentence. Constitutional rights cannot be defined in terms of literal comparisons of this nature. Indeed, relying on comparisons to establish the level of a prisoner's rights could leave the state free to make everyone's lot worse instead of better. *Nadeau v. Helgemoe, supra,* 561 F.2d at 417.

In rejecting strict equal protection analysis, we do not denigrate the role of courts in enjoining conditions found to be inhumane or irrational. Restrictions upon detainees that serve no proper purpose, but merely reflect the lack of imagination or energy of local officials, are properly the subject of judicial correction; so too are conditions which, for whatever reason, fall below minimum standards of humanity and decency. It is not suggested that the unappealed orders of the district court, bringing about improvements at the Jail, might not be supportable on proper grounds. We do hold, however, that judicial review in a case like this should proceed under the standard we have described with proper deference to be accorded legislative and local judgments especially in the area of security within and without the Jail.

We now turn to the specific questions raised in this appeal.

## IV

### 1. *Visitation*

■ Prior to this litigation, visitation was permitted twice a week between 1 and 3 p. m., with visits to last a maximum of one-half hour each. The court found that "[e]ach detainee theoretically had a total of four visiting hours per week". Detainees were not allowed to touch their visitors, who were separated from them by a mesh screen. The limitation of visits to two specific days from 1 to 3 p. m. was altered by the administration during the pendency of these proceedings, so that visits are now allowed "at all reasonable times"; however, the administration did not indicate how many visits would be allowed, and plaintiffs complain that in failing to specify limits the administration meant to retain arbitrary control of visits on an *ad hoc* basis. The court undertook to clarify matters by ordering that each detainee be allowed three hours of visits a day. It also ordered that prisoners be allowed to have physical contact and communication with their visitors. The authorities complain that the three-hour rule will "produce severe overcrowding to the detriment of jail security and visitation conditions". They also are of the view that the opportunities for conveying contraband or taking a hostage are too great to allow contact visits.

Visitation rights, besides having to meet the previously described due process standard, reflect first amendment values, most clearly the right of association. The Supreme Court has recently said, in the case of convicts, that the "associational rights that the First Amendment protects outside of prison walls" are "the most obvious of the First Amendment rights that are necessarily curtailed by confinement". *Jones, supra,* 433 U.S. at 125–26, 97 S.Ct. at 2540. This was said, however, in the context of an asserted right of prisoners to unionize—a novel assertion posing an obvious threat to prison administration. For detainees to receive visits at regular intervals from loved ones and friends is a commonly accepted privilege; has been recognized at the Jail; and implicates, in the case of detainees especially, communicative as well as associational values protected by the first amendment. A refusal, therefore, to allow the ordinary detainee any visitation privileges, or the laying down of capricious limitations not justified by considerations of jail security and order, would be unconstitutional. *See Procunier v. Martinez,* 416 U.S. 396, 411–12, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The Constitution does not, however, require that visitation be allowed on every day of the week. What days and hours and circumstances are reasonable is largely for the local authorities to decide in the first instance, subject only to limited court review for arbitrariness. Except where their decisions are arbitrary, a court must normally defer to the judgment of jail authorities. *Jones, supra.*

■ In the present instance, the district court could conclude that is was arbitrary and capricious for Jail authorities, after abolishing the restrictive twice-weekly rule, not to issue a new rule or rules of general application clarifying what amount of visiting would be permitted. No valid security reason was presented for denying detainees and their relatives and friends a set of standards enabling them to plan visits. The situation which the court properly sought to correct was one that left each detainee at the unfettered discretion or whim of the sheriff and his assistants.

However, only if the authorities decline to promulgate any rule although invited to do so, or insist upon a patently inadequate one, should courts promulgate their own rules. The Jail is entitled to decide how many hours a week of visits are feasible, taking account both of the physical limitations of the Jail and the reasonable internal and external security needs of the institution. The authorities should have a further opportunity in light of this opinion to initiate a rule which the court may then reject if it should be capricious or otherwise unjustified. We vacate the three-hour requirement and remand for further proceed-

ings which will allow the Jail authorities to establish, and the court further to review, a suitable specific visitation rule.

As for contact visits, we can discover no constitutional guarantee that such visits may take place. The question is simply whether considerations of Jail security and order make it reasonable for the authorities to refuse visits of this nature. In ordering such visits over the wishes of Jail authorities, the court relied on the fact that contact visits were allowed at the New Hampshire State Prison. That is a factor relevant in deciding whether the exclusion of contact visits is an arbitrary practice, but it is not conclusive. That institution may be constructed so that contact visits are more manageable, or there may be other factors making such visits feasible there. There may even be legitimate differences of opinion among state and local authorities as to what practices are safe within their particular institutions. Unless the denial of contact visits on security grounds can be found, on the basis of evidence of record, and with reasonable deference to the expertise of Jail authorities, to be an "exaggerated" response by Jail officials, see *Jones, supra,* the district court should not have substituted its judgment as to security needs for that of the officials.

We do not believe such a finding can be made on this record. Contact visits present a unique opportunity for passing contraband, including weapons and drugs, into the Jail. The district court suggested that authorities could guard against this danger by searching both visitors and detainees, but this observation only highlights the difficulty of outsiders substituting their judgment as to how a jail should be run for that of those responsible for the institution. Visitors and detainees might resent thorough searches as too intrusive, and Jail officials might believe contraband could still slip through in spite of the most extensive precautions. That the responsible authorities have chosen one particular method of countering a conceded threat to the security of the Jail, and not some other, ought to be a decision sustained by a reviewing court as long as it is rationally supportable. The humanity and possible soothing effect of contact visits are qualities that Jail officials properly should consider in passing on their desirability. But whatever the wisdom of a decision to reject these benefits in favor of a harsher regimen for detainees, we cannot say that the choice is unsupportable. The term of confinement at the Jail is often very brief—in many cases only a week or less—and a substantial number of detainees have only recently been removed from drug or alcohol habits. Consequently we reverse the order of the district court to the extent it requires contact visits at the Jail. If the Jail officials have found that their experience under the court order has eased some of their fears about contact visits and demonstrated benefits to the detainees, it is of course open to them, as a matter of choice, to continue the practice.

2. *Telephone Privileges*

The district court ordered Jail authorities to permit inmates a reasonable number of daily social telephone calls, not to exceed ten minutes each. The court justified the order by comparing the status of detainees to that of bailees:

"Persons freed on bail have full and free access to telephones and may call anyone to discuss any matter without having to account for the reasons for the call. This court does not know of, and defendants have not put forward, any reason why plaintiffs, as incarcerated accused, should not be allowed the same access."

This standard is incorrect both because the court wrongly compared the freedom of those on bail and of detainees, and because the court wrongly placed the burden of justification entirely upon the state. By applying too demanding a standard to the actions of the Jail authorities, the court failed to consider whether limitations on telephone use reasonably reflected legitimate apprehensions about the security and order of the Jail. At the same time, the Jail officials did not introduce evidence sufficient to assess the reasonableness of their assertion that a complete ban on social calls

is necessary to satisfy their proper concerns. The matter is not free from doubt: numerous courts have confronted the question of access to telephones by detainees and, although many have used a standard of review more exacting than that we believe appropriate, the consensus has been in favor of at least some access. *Compare Dillard v. Pitchess,* 399 F.Supp. 1225, 1240 (C.D.Cal.1975); *Inmates of the Suffolk County Jail v. Eisenstadt, supra,* 360 F.Supp. at 690; *Collins v. Schoonfield, supra,* 344 F.Supp. at 279; *Brenneman v. Madigan,* 343 F.Supp. 128, 141 (N.D.Cal.1972); *Jones v. Wittenberg, supra,* 330 F.Supp. 707, 719 (N.D.Ohio 1971), *with Inmates of Milwaukee County Jail v. Petersen,* 353 F.Supp. 1157, 1169 (E.D.Wis.1973). Although the Jail permitted detainees to receive calls from their attorneys, the restriction was so all-encompassing as to limit the ability of a detainee to investigate and prepare his defense. *Cf. Bounds v. Smith, supra.*

Consequently we believe the district court should reconsider this portion of its order in light of legitimate concerns expressed by Jail authorities with regard to security. Evidence as to how other, similar facilities handle the problem and as to what security risks exist at the Jail would be useful. Jail officials and the court might consider reasonable ways of accommodating the interests of detainees with those of the Jail, such as by making access to a telephone contingent on recognition of the authority of guards to monitor the conversations. The particular formula for regulating telephone use should be left to the sound discretion of Jail officials, subject to review by the district court to guard against unreasonable restrictions.

### 3. *Mail Privileges*

The district court upheld the authority of Jail officials to inspect incoming mail but ruled that mail sent by detainees should not be opened without a search warrant. It reasoned that because detainees' visits went unmonitored, escape plans or contraband "drops" could be plotted regardless of any surveillance of correspondence. The court apparently discounted the state's argument that because visits were limited to a relatively small number of approved persons, they presented less of a security risk.

The Supreme Court has passed on the closely related question of the first amendment rights of those who correspond with convicted prisoners. *Procunier v. Martinez, supra.* There the Court held that censorship of prisoner mail could be no greater than necessary to the protection of the particular governmental interest involved, security being one of the recognized state interests. 416 U.S. at 413, 94 S.Ct. 1800. The state here, however, asserts not a right to withhold mail but only the right to monitor. *Martinez* clearly recognized such a power in prison officials as a necessary incident of exercising an appropriate censorship function. *Id.* We do not believe the first amendment rights of those who correspond with detainees, or of detainees themselves, necessarily are any greater. Rather we concur with the Seventh Circuit, which recently observed:

> "We may take judicial notice of the fact that an opportunity for secret and lengthy communication between a detainee and his friends or relatives would substantially enlarge his opportunity for successful escape. We have no doubt that over the course of time some persons would take advantage of that opportunity."

*Smith v. Shimp, supra,* 562 F.2d at 426. To the extent New Hampshire disavows any intention of scanning mail sent to counsel, public officials, or the news media, the surveillance procedures employed were the same as those sustained in *Shimp.* We must permit these procedures here, and accordingly the portion of the district court's order concerning outgoing mail is reversed. On remand, the district court will be free to address the question, should it be necessary, of what steps might be required to ensure the censorship practices at the Jail—i. e., the withholding of particular communications—conform to *Martinez.*

## 4. Personal Belongings

The district court ordered Jail authorities to prepare a list of personal property that inmates could keep in their cells, using as its standard that in effect at the New Hampshire State Prison. The court held that equal protection mandated this ruling:

"While plaintiffs may not have a constitutional right to have a television or other personal property in jail, it is a constitutional requisite that defendants justify as absolutely necessary the rule that forbids all personal property at the Rockingham County Jail. I find it highly significant that the New Hampshire State Prison and another New Hampshire county jail allow inmates to have a variety of personal items, and it is unlikely that the introduction of such approved personal items at the Rockingham County Jail would create undue security risks at that institution that are not posed at others. Further, denial of this privilege to Rockingham County Jail detainees constitutes a denial of equal protection when both convicted inmates and pretrial detainees at other jails and prisons are permitted to have approved personal items."

The items held to be admissible included televisions, radios, tape cassette players, clothing, food, and tobacco. The Jail officials protest that some of these items can be used as weapons or to start fires, while all of items facilitate the concealment of contraband by cluttering the cells and create a risk of conflicts among inmates by causing property disputes.

Even as a comparison, the district court's argument was flawed inasmuch as it overlooked differences in both the facilities and inmate populations at other institutions. A quantity of personal possessions that might be tolerable in one prison with larger cells might amount to intolerable clutter at the Jail. An inmate's need for a variety of personal effects might be greater at an institution where the average stay was lengthy than at a local jail with a high rate of turnover in its population. Furthermore, as we have indicated above, even if the comparison were a fair one, the contrast in the restrictions employed would only be evidence of the possible arbitrariness of the Jail's total ban on personal property, but not conclusive.

In light of the record now before us, we are unable to hold that a complete prohibition of personal belongings at the Jail would be reasonably related to the asserted state interests in security and order. At the same time, the list of approved items ordered by the court seems far too extensive in light of the appropriate standard of review. Accordingly, we remand this question to the district court to afford Jail officials an opportunity to determine in the first instance what personal items could be allowed in detainees' cells without unduly hampering the efforts of the officials to maintain order and security.

## 5. Counsel at Disciplinary Proceedings

In place of the completely unstructured disciplinary program then in effect at the Jail, the district court substituted a system that incorporated published rules, advance written notice of charges, an impartial fact finder, power to call witnesses, and permitted a detainee to retain counsel. The defendants appeal only the last part of the order, arguing that the presence of counsel exceeds the requirements of due process and imposes an unreasonable burden upon the Jail. The court, to the contrary, found that the presence of counsel would not impose a burden to security and, to the extent such dangers were present in particular circumstances, permitted exclusion of counsel upon a showing by Jail officials that a security threat existed.

The Supreme Court has addressed the counsel issue with regard to convicted prisoners. In *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Court said:

"[A]s we have indicated, the fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully commit-

ted. . . . Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply. . . . In sum, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application."

*Id.* at 556, 94 S.Ct. at 2975. With particular regard to the presence of counsel in prisoner disciplinary proceedings, the Court observed,

"The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. . . .

"Where an illiterate inmate is involved, however, or where the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by staff."

*Id.* at 570, 94 S.Ct. at 2981.

Due process is a flexible concept, and the court must in each case focus on the competing interests of the parties. *See Gagnon v. Scarpelli*, 411 U.S. 778, 790, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *Downing v. LeBritton*, 550 F.2d 689, 691 (1st Cir. 1977). We are not dealing here with criminal proceedings. *Baxter v. Palmigiano*, 425 U.S. 308, 316, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). Looking to the state's interests, we note both the risk of delay and the heightened adversarial stance of the proceeding caused by the presence of counsel. Unlike the procedures involved in *Baxter* and *McDonnell*, no "correctional goals" as such are implicated here, but the state's very real interests in order and security are present

to the same extent as in those cases. Consequently, we cannot hold that detainees have a right to retain counsel in all cases, especially in light of the already elaborate procedural safeguards to which Jail officials have acceded. We do not believe that due process requires greater participation by counsel in these proceedings than that required by *McDonnell* and *Baxter* in the prisoner context, namely that those accused of disciplinary infractions may obtain some form of legal counselling where illiteracy or the complexity of the issues makes it unlikely the detainee will be able adequately to apprehend the case unassisted. We remand this portion of the order to the district court for appropriate modification.

### 6. *Transfers*

New Hampshire Revised Statutes Annotated § 623:3 provides:

"*Transfer to State Prison.* Any person who is confined awaiting trial on a felony charge, may be transferred to the state prison, from the county jail or house of correction, upon the recommendation of the sheriff, and with the approval of the county commissioners of said county."

Before the district court's order in this case, Jail officials transferred detainees pursuant to this section whenever they believed transfer to be desirable. Among other purposes, these transfers enabled the officials to relieve overcrowding. The district court, however, held that the transfers occasioned substantial hardships for the transferees inasmuch as the conditions of confinement were in some respects more onerous at the state prison. The court distinguished two recent Supreme Court cases involving the due process rights of convicts transferred among prisons, *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), and held that various due process rights applied to such transfers.

We do not agree that *Meachum* and *Montanye* are distinguishable. It is true that convicted prisoners have been constitutionally deprived of their liberty, and

that therefore the only liberty interests retained that require the protection of due process are those created by state law. But it is equally true that detainees also have been constitutionally confined for legitimate state purposes. A mere relative worsening in the conditions of this confinement does not trigger any constitutional interest, as long as the "nature and duration" of the new form of incarceration does not exceed the original purpose for which the detainee was committed, *Jackson v. Indiana, supra*, 406 U.S. at 738, 92 S.Ct. 1845. And as the above quoted statute makes clear, plaintiffs have no claim grounded in state law to which due process may attach. Accordingly, we reverse the order of the district court inasmuch as it specified certain procedural prerequisites to transfer of detainees.

*The order of the district court is vacated and remanded in part, and reversed in part.*

COFFIN, Chief Judge (dissenting).

The court's opinion, while obviously thoughtful and responsive to understandable concerns, seems to me to proceed from false constitutional premises and to reject virtually all of the case law affecting pretrial detainees. The court begins, soundly enough, by recognizing that detainees have not yet been tried and found guilty and that current authority allows their liberty to be taken "only to the extent necessary to ensure their presence at trial." When the analysis reaches its end, however, we find that only those restrictions which are inhuman, serve no proper purpose, or are arbitrary and capricious in that they "merely reflect the lack of imagination or energy of local officials" may be judicially corrected. The path the court takes is the following: (1) encroachment on a detainee's liberty is permitted only if necessity requires it; (2) orderly and secure prisons are necessary to assure the detainee's presence at trial; (3) deference to local authority requires that a state need meet only a minimal burden to establish the nexus between the treatment of detainees and the goals of prison security. Therefore, the state may impose on pretrial detainees any condition of confinement that it can reasonably relate to its institutional concerns for safety and order in the prison where they are incarcerated. Through this logic the "necessity" of the court's initial principle is transformed to include the farthest limits of administrative rationality.

I appreciate some of the implicit and explicit premises which have led the court to this conclusion. There is a clear lack of commitment on the part of the body politic to provide significantly increased funding for correctional facilities. Courts in general and federal courts in particular are naturally reluctant to intrude into the administration of state and local government activity. While pretrial detainees are presumptively innocent of the charges against them, they may well be dangerous individuals who pose security risks for custodial authority.

Indeed, the court's formulation and analysis would comport perfectly with a constitution that guaranteed that "no citizen may be deprived of his liberty without due process of law except for encroachments deemed by legislative or administrative judgments to bear a reasonable relationship to legitimate societal interests." Such a guarantee would be entirely coherent; it would respect majoritarian decisions as to funding priorities, support institutional efficiency, and minimize federal court intrusions in state and local affairs. But this is not our constitution.

Nor does the overwhelming majority of the many courts which have considered the rights of pretrial detainees so view the constitution. I attempt to marshal the authorities below. But before considering these, I do not wish to appear to do a disservice to the authorities relied on by the court. Perhaps most pertinently the court, in suggesting a new standard with which to evaluate conditions of confinement of pretrial detainees, quotes Supreme Court language that " 'At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.' *Jackson v. Indiana,* 406 U.S. 715, 738

[92 S.Ct. 1845, 1858, 32 L.Ed.2d 435] (1972)." The context in which that quotation is taken from in *Jackson,* a case involving the indefinite commitment of a person incompetent to stand trial, makes it clear that the Court was referring to the nature of the proceeding through which a state may incarcerate a person indefinitely and that the proceeding in question had not met the most minimal standards of due process. The case says nothing about conditions of confinement or the standards under which they should be evaluated.

I have found only three pretrial detainee cases which appear to provide support for the majority's standard. *Seale v. Manson,* 326 F.Supp. 1375 (D.Conn.1971) focused on the rights of two particular detainees, both of whom were accused of serious criminal offenses. However, it is clear that the reasonable relation standard utilized in *Seale* is no longer the law of the Second Circuit, *see Rhem v. Malcolm,* 507 F.2d 333, 336–37 (2d Cir. 1974); *Detainees of Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392, 397 (2d Cir. 1975); *United States ex rel. Wolfish v. Levi,* 406 F.Supp. 1243, 1247 (S.D.N.Y.1976).

The second case, *Duran v. Elrod,* 542 F.2d 998 (7th Cir. 1976), appears to present several standards, one of which, "that as a matter of due process, pre trial detainees may suffer no more restrictions than are reasonably necessary to ensure their presence at trial", is consistent with the court's opinion in the present case. Other language in *Duran* suggests a more protective view of detainee's rights. The opinion specifically permits detainees to present evidence as to whether their privileges can be increased "without jeopardizing the security of the institutions or requiring unreasonable expenditures." A later Seventh Circuit case strongly suggests that deprivations imposed on pretrial detainees must receive some sort of rigorous scrutiny. In *Smith v. Shimp,* 562 F.2d 423 (7th Cir. 1977), the court discusses *Duran* without ever mentioning a "reasonably necessary" standard. Instead, it states that "if conflict between the state's interest in jail security and the civil liberties of the detainees can-

not be avoided or limited by reasonable means, the latter must yield." *Id.* at 426. This rule simply states the obvious—that the courts will not uphold unreasonable demands on the part of detainees and that there must be rational limits on their civil liberties if custody is to be maintained. It does not indicate that any "reasonable" deprivation imposed by the state will be upheld irregardless of whether sufficient security and order could be maintained by less restrictive means. Indeed, the court states this specifically, "We may assume that the defendants' practice would be unconstitutional if the interest in jail security could be protected by less burdensome means." *Id.* at 426.

The third case, *Main Road v. Aytch,* 565 F.2d 54 (3d Cir. 1977), does not detail a specific standard with which to evaluate the conditions of confinement of pretrial detainees, but it does suggest that prison authorities should be given considerable deference in their attempts to maintain security in prisons both for convicted prisoners and pretrial detainees alike. It is difficult to tell how much of the court's analysis was meant to apply to general conditions of confinement of pretrial detainees and how much of it was limited to the facts of the particular case being adjudicated. The Third Circuit was confronted with a mixed plaintiff class of pretrial detainees and convicted criminals (although the large majority were detainees); the district court had found that governing the two groups under separate regulations would not be feasible; detainees did not receive fewer privileges than their convicted counterparts; and while the privilege sought in the suit, the right to hold group press conferences, was denied, other forms of communication with the press such as mail and individual interviews were permitted. To the extent that the Third Circuit would extend equivalent deference to prison authorities whether they were holding convicted criminals or pretrial detainees in custody in most circumstances, not simply those described above, it provides support for the court's opinion in the present case.

I would not characterize these authorities as being a doctrinal source for a "reasonable relationship" test. In any event, the almost universal state of authority is in stark disagreement with the court's analysis. Indeed, the rigorous standard of scrutiny described by the district court below has been approved in both its aspects. Deprivations may be imposed on detainees for legitimate purposes such as institutional security only if such deprivations are justified by "compelling necessity", *see, e. g., Detainees of Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392, 397 (2d Cir. 1975); *Rhem v. Malcolm,* 507 F.2d 333, 336 (2d Cir. 1974); *Martinez Rodriquez v. Jimenez,* 409 F.Supp. 582 (D.P.R.1976); *United States ex rel. Wolfish v. Levi,* 406 F.Supp. 1243, 1247 (S.D.N.Y.1976); *Manicone v. Cleary,* 74 C. 575 (E.D.N.Y.1975); *Brenneman v. Madigan,* 343 F.Supp. 128, 138–39 (N.D.Cal. 1972); *Jones v. Wittenberg,* 323 F.Supp. 93 (N.D.Ohio 1971) ("absolute requisite" instead of compelling necessity), *aff'd sub nom., Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972), or if the deprivation is the least restrictive alternative available to maintain order and security, *see, e. g., Miller v. Carson,* 563 F.2d 741 (5th Cir. 1977); *Smith v. Shimp,* 562 F.2d at 426 (7th Cir. 1977); *Rhem v. Malcolm, supra,* 507 F.2d at 337; *Mitchell v. Untreiner,* 421 F.Supp. 886 (N.D. Florida 1976); *United States ex rel. Wolfish v. Levi, supra,* 406 F.Supp. at 1247; *Manicone v. Cleary, supra; Dillard v. Pitchess,* 399 F.Supp. 1225 (C.D.Cal.1975); *Cudnik v. Kreiger,* 392 F.Supp. 305 (N.D.Ohio 1974); *Wilson v. Beame,* 380 F.Supp. 1232, 1236 (E.D.N.Y.1974); *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676 (D.Mass. 1973); *Smith v. Sampson,* 349 F.Supp. 268, 271 (D.N.H.1972); *Brenneman v. Madigan, supra,* 343 F.Supp. at 138; *Hamilton v. Love,* 328 F.Supp. 1182 (E.D.Ark.1971); *Palmigiano v. Travisono,* 317 F.Supp. 776 (D.R.I.1970).

The compelling necessity standard is often derived from an equal protection analysis while the concept of least restrictive alternative is rooted in due process doctrine. However, regardless of their doctrinal source the two standards tend to meld together when they are applied. Often what results is the practical rule of thumb that, *at the least,* the state cannot provide its pretrial detainees with less tolerable conditions of confinement and privileges than it makes available to convicted criminals. *United States ex rel. Tyrrell v. Speaker,* 535 F.2d 823, 827 (3d Cir. 1976); *Rhem v. Malcolm, supra,* 507 F.2d at 336; *Campbell v. McGruder,* 416 F.Supp. 100 (D.C.D.C.1975); *Martinez Rodriguez v. Jimenez, supra,* 409 F.Supp. at 593; *Miller v. Carson,* 401 F.Supp. 835, 839, 864 (M.D.Fla.1975); *Dillard v. Pitchess, supra,* 399 F.Supp. at 1235; *Inmates of Suffolk County Jail v. Eisenstadt, supra,* 360 F.Supp. at 686; *Smith v. Sampson, supra,* 349 F.Supp. at 272; *Conklin v. Hancock,* 334 F.Supp. 1119, 1121–22 (D.N.H.1971).

This "rule" has the benefit of appealing simplicity, but it is open to the serious criticism that it provides too low a floor for the rights of detainees. *See Brenneman v. Madigan, supra,* 343 F.Supp. at 137–40; *Hamilton v. Love, supra,* 328 F.Supp. at 1191; *Jones v. Wittenberg, supra,* 323 F.Supp. at 100. This seems obvious on a theoretical level. While the detainee has lost the right to be a fully free citizen, he has not been found guilty of an offense for which he may be punished by constitutionally appropriate procedures. Since no one seriously maintains that prisons for convicted criminals are solely custodial and devoid of punitive dimensions, to equate the conditions under which a detainee may be confined with those imposed on a convicted criminal is irrational and unfair. The more appropriate analogy would be to equate the treatment of a detainee with that of a bailee with the obvious proviso of the additional deprivations necessary to safely keep the detainee in custody. *See, e. g., Patterson v. Morrisette,* 564 F.2d 1109 at 1110 (4th Cir. 1977); *Detainees of Brooklyn House of Detention for Men v. Malcolm, supra,* 520 F.2d at 397; *Martinez Rodriguez v. Dimenez, supra,* 409 F.Supp. at 594; *Miller v. Carson, supra,* 401 F.Supp. at 856–57; *Cudnik v. Kreiger, supra,* 392 F.Supp. at 331; *Inmates of Milwaukee County Jail v. Petersen,* 353 F.Supp. 1157, 1160 (E.D.Wis.1973).

Unfortunately, the vision of constitutional theoreticians must be tempered by harsh realities. It is one thing to say that pretrial detainees may not be punished as courts have repeatedly held, *see Mitchell v. Untreiner, supra,* 421 F.Supp. at 894; *Miller v. Carson, supra,* 401 F.Supp. at 839–40, 867; *Dillard v. Pitchess, supra,* 399 F.Supp. 1232, 1234; *Inmates of Suffolk County Jail v. Eisenstadt, supra,* 360 F.Supp. at 685–86; *Inmates of Milwaukee County Jail v. Petersen, supra,* 353 F.Supp. at 1160; *Brenneman v. Madigan, supra,* 343 F.Supp. at 136; *Conklin v. Hancock, supra,* 334 F.Supp. at 1191; *Jones v. Wittenberg, supra,* 323 F.Supp. at 100; it is quite another to insist that such a principle be rigidly enforced. It would be impossible, without playing fast and loose with the English language, for a court to examine the conditions of confinement under which detainees are incarcerated, even after extensive judicial relief, and conclude that their custody was not punitive in effect if not in intent. Yet there are practical limits to the scope of remedial relief available to the courts which make such results unavoidable.

If courts did not look to the conditions of confinement of convicted criminals, they would be adrift between two almost limitless absolutes. The major reason that detainees are subject to harsh conditions of confinement has nothing to do with safety requirements. It is because society has not made available sufficient funds to provide a safe and comfortable custodial environment for them. Indeed, once a detainee has been incarcerated to guarantee his presence, there would seem to be no justification, other than lack of funding, for denying him any of the amenities of life; given enough resources almost any privilege can be given detainees consistent with prison security concerns. Thus, one reason for courts looking to the treatment of convicted criminals for guidance is that it gives them some general sense of minimally acceptable conditions of confinement which society is willing to support.

The other reason is that almost any deprivation can be explained or defended by the justification that it improves the security of a jail or prison. By looking to security arrangements in other prisons, the courts can better evaluate claims that the denial of a privilege is essential to security. If other institutions make that privilege available to their inmates without suffering any significant adverse consequences, courts should reject the unsubstantiated view of prison authorities that the privilege is a security risk. In effect the existence of a privilege in another prison facility raises a presumption that it may be offered detainees without jeopardizing institutional security. That presumption may be rebutted, but only by clear and convincing evidence.

By using the rule that detainees must be treated at least as well as convicted criminals, courts limit their discretion and avoid the temptation of imposing value judgments on society that are not mandated by the constitution. This is the very result the court's opinion insists a more deferential standard is necessary to achieve. The rule is unfair to detainees under any abstract theory of justice. It permits the innocent to be punished, the accused to be lumped together with those adjudged guilty by a court of law. Still if applied as a strict minimum with the benefit of the doubt given to the detainees, I believe it is the most practical, workable, and just rule that courts can develop at this time.

Of course the rule has its defects and it is to some extent subject to manipulation. However, if it is applied in the spirit described above, these problems can be surmounted. For example, it is argued that legislatures may simply reduce the quality of conditions of confinement across the board to the lowest common denominator. First of all, they could certainly take such action under a lesser standard; and an absolute standard may stifle progressive flexibility in an effort to prevent potential backsliding. Second, there is no indication that legislatures have responded in this manner in reaction to judicial commands that conditions for detainees be improved. Indeed, many states have not appealed at all or appealed only a small part of the remedies ordered by courts. Third, courts are not

expected to apply the standard in a temporal or geographical vacuum. If a privilege existed and was not a threat to institutional security in the past, there is no reason to assume it will be a problem in the future simply because it is no longer offered to the convicted criminal population. Similarly, if a privilege can be safely offered in a majority of the states, courts should require hard evidence as to why it would create safety problems in a particular institution.

Another problem and one raised by the court's opinion is that comparisons between the detainee population and the criminal population are inexact as to safety needs. This may indeed be the case. A detainee awaiting trial for murder may be more of a threat and require more stringent security precautions than a convicted car thief. I harbor no illusions that the detainee population may not include serious security risks, although I might also note that many detainees differ from bailees solely in their inability to finance their freedom by posting bail. However, just as correctional systems routinely differentiate between minimum, medium, and maximum security risks among convicted criminals, there is nothing to stop them from making similar distinctions, if supported by evidence, between detainees. Not all detainees need be treated alike. What is unacceptable is imposing restraints reserved for maximum security risks on the entire population of detainees simply because they are detainees.

Finally, it may be argued that differences in the physical structure of different prisons make an exact comparison of privileges a poor guide by which to evaluate security requirements. To some extent this is true. I believe a court could take account of these differences by grouping privileges for comparison. Thus, if the structure of one prison limited the number of visitors that could safely be accommodated, it could expand some other associational or communication privilege such as telephone access to compensate for more limited visiting hours. However, what is totally unacceptable is the view that one needless deprivation can be used to justify a further deprivation. Thus, in the instant case detainees are housed in abysmally small rooms approximately 7 ′ × 5 ′ in size. There is no justification based on institutional security needs to account for these conditions of confinement. Yet the court argues that because their rooms are smaller than the rooms available to convicted criminals, detainees may not be permitted to have as many or similar personal belongings as convicted criminals because such belongings might "clutter" their rooms. Under this form of analysis, the only floor to the conditions of confinement imposed on a detainee would be gross inhumanity. I believe the contrary to be the case. If the physical structure of a particular jail is such that there is no way that privileges routinely offered to convicted criminals can be made available to pretrial detainees, the constitution prohibits the state from incarcerating detainees in that facility.

Applying the standards I suggest to the particular issues on appeal in the present case, I would disagree with the court's conclusions on most but not all of them. On some issues, while I believe the district court may have gone further than the constitution requires, I would argue that the plaintiffs are entitled to greater relief than the majority here would permit. On other issues I would affirm the district court's analysis and conclusions in their entirety. However, since the standard of evaluation I contend the constitution requires has not been adopted by the court, I see little point in detailing exactly how my standard's application would differ from the altogether different analysis of my brothers. The focus of my dissent is the basic framework of pretrial detainee rights, not the nuances of how different judges might apply particular standards.