Paulo ARRUDA, Plaintiff,

v.

Michael V. FAIR, et al., Defendants.

Civ. A. No. 80–2124–C.

United States District Court,
D. Massachusetts.

Sept. 29, 1982.

Paulo Arrudo, pro se.

Merriann Panarella, Hale & Dorr, Boston, Mass., for plaintiff.

John W. Bishop, Sp. Asst. Atty. Gen., Dept. of Correction, Joanna Connolly, Boston, Mass., for Paula, Hume, Corriera, Fahey, Bialach, Ayala, Madeiros and Spallino.

Michael C. Donahue, Sp. Asst. Atty. Gen., Sheridan, Garrahan & Lander, Framingham, Mass., for Hogan, Berman, Ponte, Fenton, Argeropulos & Lamberth.

Lee Carl Bromberg, Bromberg, Sunstein & McGregor, Boston, Mass., for Daniel Thompson, Thomas DaSilva and Anthony Silva.

### MEMORANDUM

CAFFREY, Chief Judge.

This civil rights action has been brought pursuant to 42 U.S.C. § 1983 by Paulo Arruda ("Arruda"), who currently is incarcerated at the Massachusetts Correctional Institution at Walpole (MCI-Walpole). The defendants are Michael V. Fair ("Fair"), the Commissioner of the Massachusetts Department of Corrections, and Joseph H. Ponte, the Superintendent of MCI-Walpole. Plaintiff challenges as violative of no less than four of his constitutional rights the search policy at MCI-Walpole as it has been applied to the inmates of Walpole's Departmental Segregation Unit ("DSU"), in which Arruda until recently was imprisoned, and to which he is scheduled to return in the near future. The relief sought by plaintiff includes (1) a declaratory judgment to the effect that the strip search practice violates his rights under the Constitution and laws of the United States; (2) a permanent injunction enjoining the defendants and their successors, employees, or agents, from engaging in acts which violate Arruda's rights as announced by the declaratory judgment; and (3) attorneys fees and costs.

Plaintiff's claim was tried to the Court sitting without jury. Fifty-three plaintiff's and five defendants' exhibits were introduced. The parties called six witnesses, and submitted pretrial briefs and post-trial requests for findings of fact and rulings of law.

After considering all of the evidence introduced at trial as well as all the written submissions of the parties, I find and rule as follows:

*Findings of Fact:*

### The Plaintiff

1. Arruda, who is currently 23 years old, was first arrested at the age of nine for stabbing a child. He testified that he had a lengthy juvenile record and in fact does not remember the number of incarcerations he had before he was 17, although he said that number is greater than 15. One of those incarcerations was for a heroin-related offense. Arruda testified that he used drugs prior to his present incarceration. He also testified that he has experimented with heroin on the street, and has used marijuana (which he bought from another inmate) while incarcerated at MCI-Walpole.

2. The plaintiff attended school only as far as the ninth grade. He could recall holding only two jobs prior to his 1976 conviction. He worked as a dish washer at Harvard University for two weeks before leaving of his own accord because he "didn't feel comfortable" with the job. He also quit a job at a shoe-making factory after one day because he "didn't like the atmosphere at work." This was the last job he held prior to his conviction in 1976.

3. Arruda's 1976 sentence was for armed robbery. Although he was first assigned to MCI-Concord, he was transferred to MCI-Walpole following an assault in which he allegedly was involved. The plaintiff found adjustment to this transfer to Walpole to be "difficult." He was subsequently assigned to the DSU as a result of an assault in which he was involved. Arruda testified that while he was in the "general population" at Walpole (*i.e.*, while he was housed outside of the DSU), he possessed at some point a weapon for the purpose of protecting himself from other inmates. Arruda denied possessing either drugs or weapons while housed in the DSU.

4. Arruda compiled a lengthy disciplinary record subsequent to his confinement in the DSU. He was accused of various charges, including creating a health hazard by failing to clean his cell area, verbally abusing corrections officers, throwing garbage and various liquids outside his cell, and refusing to follow DSU rules and regulations. Additionally, Arruda generally refused to comply with the visual rectal search aspect of the strip search procedure discussed below.

*MCI Walpole*

5. MCI-Walpole is a maximum security facility in Walpole, Massachusetts. It is the only maximum security institution in the Commonwealth of Massachusetts, and it contains about 600 individual cells. As of January 1, 1982, MCI-Walpole housed 679 inmates.

6. A pamphlet entitled "A Statistical Description of Residents of the Massachusetts Correctional Institutions," which was prepared earlier this year by the state Department of Corrections and whose contents were stipulated to by the parties, reveals the following facts about the inmates of MCI-Walpole:

—Eighty-three percent of the population at MCI-Walpole on January 1, 1982 were serving a maximum sentence of 10 years or more. Twenty-two percent were serving a sentence of life imprisonment.

—Seventy-six percent are serving a sentence for a crime against the person.

—Ten percent are serving a sentence for murder in the first degree. Nine percent are serving a sentence for murder in the second degree. Six percent are serving a sentence for a crime of manslaughter.

—Forty-eight percent never have held a job longer than six months.

—Sixty-two percent never have held a job longer than one year.

—Only two percent have ever had any college training or college education. Sixty percent went no farther than the 10th grade in school.

—Twenty-five percent are known to have used heroin at one time or another prior to their incarceration. Fifty-three percent have used drugs at one time or another prior to incarceration at Walpole.

—Twenty-seven percent have a total of more than 20 prior court appearances. Sixty-two percent have in excess of 12 court appearances.

—Thirty-four percent have more than 8 prior charges for crimes against the person. Fifty-five percent have had more than 6 prior charges for crimes against the person. Thirty-seven percent had prior commitments to the Department of Youth Services while they were juveniles. Forty-eight percent had at least one prior charge for a drug offense. Fifty-two percent have at least one prior House of Correction incarceration.

—Sixty-six percent have at least one prior adult incarceration.

—Nineteen percent made their first court appearance at age 12 or younger. Fifty-seven percent made their first court appear-

ance by the time they were 15 years of age. Seventy-eight percent made their first court appearance by the time they were 17 years of age.

I take note of these statistical facts about the residents of MCI-Walpole solely for the purpose of determining the type of individual with whom correctional officers charged with operating and maintaining safety and order at MCI-Walpole must come in contact.

7. Defendant Ponte testified that when he first assumed the job as superintendent of Walpole in February of 1980, a National Corrections Institute Report had stated that the situation at MCI-Walpole was "out of control," and that the facility was a "jungle."

*The DSU*

8. The DSU—which also is known as Block 10—is a two-story cell block segregated from the main part of MCI-Walpole and connected to the institution on one of its four sides. The DSU was established pursuant to M.G.L. c. 127 § 39, which provides that the DSU shall house "any inmate whose continued retention in the general institution population is detrimental to the program of the institution." The DSU is the most secure classification unit of MCI-Walpole and is designed to house the state's most dangerous and violent inmates.

9. The DSU contains sixty cells which are divided into four tiers, or cell corridors. The two tiers in the upper level contain fifteen cells each, as do the two tiers in the lower level. At the end of each tier in the DSU there is a locked steel door securing the tier. In addition to the sixty cells, the DSU contains two offices, two closets, two staff bathrooms, four showers, and two visiting rooms.

10. In the DSU there are two steel doors to the outside. One steel door is at the far end of the lower tiers and leads only to the yard area. The other steel door is at the near end of the tier and is used to admit staff, visitors, and other outsiders to the DSU. There is a steel door separating the DSU from the remaining prison population. The door is located on the DSU on the near side of the tier between the upper and lower levels of the cell block.

11. Each cell in the DSU is approximately six feet by eight feet and contains a bed, a toilet-sink, a table and a stool. Cells on the upper tiers have access to a television built into the walls. Each cell in the DSU has two doors, one grilled door which is locked at all times and one solid steel door which is closed and locked at various times, including shakedowns, isolation and emergencies. The solid steel door contains a window which is approximately four inches by five inches. There are no windows in the cells of the DSU with the exception of the window in the solid steel door.

12. There is one visiting room on the upper tier of the DSU and one visiting room on the lower tier. All visits to a DSU inmate take place in one of these visiting rooms. The visiting rooms are searched every day. Each visiting room is approximately eight feet wide by ten feet long and is partitioned into two equal areas by a heavy steel mesh security screen. Along the middle of the partition are two built-in tables, one on either side of the screen. Each visiting room contains one or two chairs on each side of the partition.

13. Each visiting room has two doors, each of which leads into a different side of the partitioned room. A solid steel door leads into one half of the visiting room and a grilled door leads into the other half. Both doors are locked during all visits.

14. More correction officers per inmate are assigned to the DSU than to any other cell-block or prison area in MCI-Walpole. The officers in charge of each shift must designate an officer assigned to the DSU to make regular hourly rounds, insuring that each DSU inmate is physically observed and accounted for. The officer in charge of each shift must maintain a DSU log and must make sure that it is kept up to date on a daily basis. A tier officer must keep the daily tier log for DSU residents assigned to his tier.

15. DSU regulations require that searches of the cell areas, showers, recreation areas, visiting rooms, and corridor areas be conducted daily. Regular searches of DSU cells and personal property are conducted by officers once or twice per week. These searches must be logged in the DSU search log. The search log must include the date, time of the search, contraband found, whether the inmate was present, and the name of the officer(s) conducting the search.

16. Upon entry, DSU inmates are informed that they will be constantly observed and notations will be made in their record regarding their daily attitude and cooperation.

17. DSU inmates housed in the upper tier may go to the yard for recreation four times per week for one hour on each occasion. DSU residents housed in the lower tier may go to the yard three times per week for one hour on each occasion. At all times DSU officers supervise all inmates who are exercising or participating in recreation in the DSU. The exercise area consists of several 2-feet by 15-feet runs, each completely enclosed by a wire fence or cage.

18. All DSU inmates are placed in restraints prior to the opening of their cell doors. Only one DSU inmate is released from his cell to the cell corridor at any one time. All DSU inmates who leave their cell are in restraints and are accompanied by a two-officer escort at all times.

*Contraband*

19. The introduction of contraband at MCI-Walpole is a major institutional problem, and is of great concern to both Superintendent Ponte and Commissioner Fair. Contraband may include any number of items, but it most often consists of weapons, drugs and money. Each of these items is considered contraband in the general population of MCI-Walpole and in the DSU. During the time he was in general population, Arruda not only bought marijuana from another inmate, but also possessed a weapon in order to protect himself from other inmates, according to his own testimony.

20. Contraband is introduced through visitors, staff and other outside sources. Superintendent Ponte testified, and I find, that visitors are the major source of contraband at Walpole.

21. Prior to entering the institution a complete identification is required of all visitors. In addition, visitors are required to remove outer clothing (including shoes and belts), undergo a pat search, and pass through a metal detector on the way into the institution. Visitors are not allowed to wear valuable accessories into the institution; these must be left in a locker at the entrance. Nothing may be brought into the institution by visitors, except attorneys may bring with them pencils and legal papers. When officers conducting the pat search and the metal detector search have a reasonable suspicion that a visitor may be introducing contraband into the institution, the officer is required to request the visitor to step aside for further search. This further search may consist of a further pat search, but may also include a request to the visitor to enter a private room for a strip search. The visitor may refuse a strip search. An officer cannot compel a visitor to be strip searched. When a visitor refuses to strip search he may simply leave the institution subject to his visiting privileges being suspended.

22. Once inside the institution, a visitor who is visiting an inmate housed in the general population may make his visit either in a visiting room or an outside yard. A large number of inmates may engage in visits at the same time during an "outside yard" visit. These visits are "full-contact," *i.e.* there are no barriers between the visitor and the inmate. Following any visit, a general-population inmate typically undergoes a routine strip search, which is identical to the one that is used on a more frequent basis in the DSU, as described below. The object of the strip search is to discover the existence of any contraband that was delivered to the inmate during the visit, and to discourage the passing of such contraband by increasing in the inmates mind the prospect of being discovered in the act of

secreting contraband. Unlike a inmate of the DSU, a general population inmate who refuses to undergo a strip search following a visit is not forced to submit to the search. He is, however, immediately placed into an "awaiting action" status, kept away from contact with other inmates pending the issuance of a disciplinary report. His visitation rights are also immediately suspended.

23. A visitor to an inmate housed in the DSU is escorted at all times by a prison officer until he or she is locked into one of the two DSU visiting rooms. Visitors of inmates housed in the lower DSU tiers are locked into the half of the visiting room which has a solid steel door; a screen separates the visitor from the inmate, who is in the other half of the visiting room that has the grilled door. Arruda testified at trial, and I find, that the screen mesh of the separating barrier is wide enough for a pill to be passed from one side to the other. Visitors to inmates housed in the upper tiers of the DSU are locked along with the DSU inmate into the half of the DSU containing the grilled door. These visits are thus full contact visits. All DSU inmates are strip searched in the visiting room after the completion of a visit with any outsider.

24. Some contraband is brought into the institution by staff. Superintendent Ponte testified that since he was appointed to his position, he has attempted to bring the prison staff more firmly under the Superintendent's control than had been the case before his taking over. Eight staff members have been caught smuggling contraband into Walpole during his tenure and all eight have been terminated. Some have been successfully prosecuted.

25. Staff members entering MCI-Walpole are either pat searched or required to pass through a metal detector. If reasonable cause exists, staff members are required to remove a few articles of clothing. Staff members, however, are not strip searched. I find the policy of not subjecting prison staff to strip searches to be a reasonable policy, particularly in light of the facts that 1) most contraband is brought into Walpole by visitors, and not by staff; 2) prison staff

members are not prisoners themselves, and have not individually been alleged to be or shown to be dangerous; and 3) the negative effects that such searches would have on the ability of the prison system to attract and retain a quality staff would probably outweigh any increase in the detection of contraband which might result from such searches of staff. I therefore find that the practice of not subjecting prison staff to strip searches does not cast any light on the question of whether such searches are unreasonable, or are violative of constitutional rights when applied to Walpole residents.

*The Strip Search Policy*

26. At MCI-Walpole, strip or skin searches require the following steps, according to a May 1980 memorandum to all officers. The inmate must:

—remove all clothing, and hand clothing to the attending officer, who then searches the clothing;

—spread fingers and show hands, back and front, and wiggle fingers;

—open mouth and lift tongue;

—run hands through hair several times;

—display each ear;

—hold testicles to one side and then the other;

—raise arms to shoulder level extended to the sides;

—turn around and display back;

—lift one foot, display sole, and wiggle toes; lift other foot, display sole, and wiggle toes;

—bend over at the waist, and spread buttocks.

If the strip search procedure is performed voluntarily by the inmate there is no physical contact with the correction officer at any time. No medical personnel is required to be present during the strip search.

27. Security in the DSU is more intense than it is in the general population, including the use and frequency of strip searches. In light of the nature of the DSU and the fact that inmates are housed there only after they have proven to be disciplinary problems in general population, I find this practice to be reasonable.

28. All DSU residents are pat searched upon coming out of their cells for exercise or recreation and upon leaving the cell corridor area.

29. An inmate confined to the DSU is required to be escorted by two correctional DSU officers at any time he leaves the DSU.

30. Prior to leaving and returning to the DSU an inmate is required to undergo a strip search. This applies whenever the inmate is leaving the unit for any purpose, including law library and hospital visits.

31. When an inmate leaves the unit he is escorted by two correctional officers whose duties include guarding the inmate and insuring that the inmate has minimal, if any, contact with other inmates. Despite this precaution, an inmate may come in contact with other inmates in the law library, although DSU inmates are not permitted to visit the law library in groups of more than one. Plaintiff testified that in the law library he had contact with other inmates whom he characterized as "trustees." It is not clear to whom he was referring.

32. DSU inmates visiting the health services unit may intermingle with other inmates from the institution who have medical appointments scheduled at the same time. The DSU inmate is under escort of officers at all times.

33. Strip searches are required of DSU inmates subsequent to all visits, including attorney visits and clergy visits as well as visits from family and friends. Strip searches are not required after staff contacts with inmates in the DSU.

34. With respect to visits in both the upper and lower DSU visiting rooms, an officer stands at the outer grilled door of the visiting room, which is locked, and generally observes the visit. Inmates confined in the lower tier have their back to the officers and do not know whether or not the officers are observing their visits. Despite Arruda's testimony that he was constantly observed by an officer during all of his visits (all of which took place in the lower visiting room), it is not clear how closely officers observe visits. Superintendent Ponte testified that in his judgment it is impossible and perhaps undesirable to monitor every moment of a DSU inmate's visit.

35. Strip searches are conducted at the conclusion of a visit, after the visitor has departed and while the DSU resident is still locked into the visitor room. With respect to the visual rectal search aspect of the search, the resident is required to bend from his waist while his back is to the grilled door, while the examining officer observes from the other side of the door. Although this practice presents the possibility that other officers in the tier hallway may observe this aspect of the search, I find this practice to be reasonable in that it assures that the officer will not come in physical contact with the inmate, and provides the officer with the protection of the locked grilled door until he has determined that the inmate does not possess contraband.

36. As noted above, Arruda generally refused to comply voluntarily with the visual rectal search aspect of strip search procedure, because the search—particularly the visual rectal search aspect—made him feel "humiliated, scared, and worried about sexual assault." Arruda also testified that on occasion, the officers who executed the strip search of his body made "jokes" which included allusions to Arruda's sexual preferences. No evidence was introduced which would support a finding that any inmate at Walpole has ever been sexually molested by officers executing a strip search.

37. While Arruda never has had a family visit while housed on the DSU, he has had numerous attorney visits. Following these visits Arruda routinely refused some part of the strip search policy, usually the visual rectal search part.

38. At times Arruda went to the law library and complied with the procedure upon leaving the unit. At times he refused to comply with the procedure and was not permitted to leave the unit.

39. On at least one occasion Arruda was permitted to leave the unit to be examined in the hospital and to speak with a Deputy

Superintendent without undergoing a complete strip search. At times Arruda requested to visit the hospital but was not allowed to make the visit as a result of his refusal to comply with the visual rectal search procedure.

40. Usually when Arruda refused to comply with the strip search he was searched with some degree of force by the correctional officers. At times, "move teams" were used to compel Arruda to strip search. These move teams are armed with shields, helmets and other riot gear to protect themselves and the inmate, in case the inmate forceably resists. The inmate's clothes are removed by correctional officers, and he is forced to comply with the steps outlined in the strip search procedure.

41. In March 1979, Commissioner Fair, who was then Associate Commissioner of Corrections for Area 3, was appointed to chair a committee to review security practices on the DSU. This committee was formed after a wildcat strike by corrections officers took place to protest the numerous assaults by DSU inmates on staff. This committee made a number of security recommendations for the purpose of tightening discipline control and security on the DSU. As a result of this committee's recommendations, security was increased at the DSU during the latter part of 1979 through 1980.

42. When Superintendent Ponte was appointed to MCI-Walpole he evaluated security in the institution as a whole. Ponte made these security evaluations partly as a consequence of the above-mentioned report issued by the National Institute of Corrections which found MCI-Walpole to be a "jungle." One of the security assessments that Ponte made concerned the strip search procedures in effect at MCI-Walpole. Ponte's assessment was that the strip search procedures were not being performed in a routine and regular fashion. As a consequence of this assessment, strip search procedures in the institution were tightened, and in May 1980, a uniform procedure was established pursuant to the above-mentioned memorandum from the Deputy Superintendent for Operations.

43. In Superintendent Ponte's opinion, which I accept and adopt as a finding of fact, the flow of contraband in the DSU has been significantly reduced by the implementation of the strip search procedures.

44. Testimony was introduced at trial which proves, and I find, that during the course of strip searches a number of MCI-Walpole inmates have been discovered secreting contraband. Weapons and drugs have been discovered in the DSU, and drugs have been discovered as a result of a strip search of at least one DSU resident. While the number of contraband discoveries made as a result of strip searches is rather small, this fact is inconsequential, for it is clear to me, and I find, that the strip search procedure at MCI-Walpole—including the visual rectal search segment of the procedure— acts as a substantial deterrent to the introduction of contraband in both the DSU and the general population.

45. Plaintiff's expert witness, Dr. Michael Nelson, testified that an item secreted in a person's rectal cavity between the sphincter muscles cannot be detected from mere exterior examination of the anus. His opinion, thus, was that the visual rectal search aspect of the strip search could not achieve its intended purpose of detecting and deterring the secreting of contraband. Dr. Nelson's testimony, however, fails to take into account the fact that contraband may be detected through the visual rectal search when the inmate is required to spread the cheeks of his buttocks while bending over, thereby releasing objects which could be secured between the cheeks and outside of the annus while the inmate is standing. Second, Dr. Nelson fails to take into account the possibility of "trailing," *i.e.*, the failure of a person attempting to secret within his rectal cavity contraband encased in a balloon-like device to insert all of the encasement material beyond the anus. I reject Dr. Nelson's opinion on this topic, as well as his opinion on the negative psychological effects of strip search policy on the residents of MCI-Walpole.

46. The defendant's expert, Robert Israel, testified, and I find, that strip searches

are the least intrusive and most effective procedure by which to control, deter and discover contraband which prison inmates have secreted on their bodies. The sole practical alternative is a pat search, which, because it requires prison guards to actually touch the inmates, leads to complaints by both guards and prisoners, confrontation, and even avoidance of the procedure. Objects which may be discovered during the course of a visual rectal search but which could possibly escape detection if only alternative search procedures were used include pens and drugs.

47. Disciplinary Reports ("D-Reports") are given to DSU residents, including Arruda, who refused to submit to visual rectal searches when ordered to do so. D-Reports result in disciplinary sanctions upon a finding of guilty. Disciplinary sanctions, including room detention, loss of visits, loss of yard privileges and isolation, may be given to DSU residents for refusing to submit to a visual rectal search when ordered to do so. Some DSU inmates including Arruda have remained longer in the DSU because of their refusal to submit to visual rectal searches. The Classification Board which determines whether a resident may be released to the general population considers compliance with the strip search policy.

48. I reject plaintiff's contention that the strip search procedure as applied to DSU inmates constitutes additional, unlawful punishment because it serves no positive purpose. On the contrary, I find that the strip search has the positive lawful effects on the DSU of both detecting contraband and deterring the secreting or attempts to secret contraband by DSU residents on their persons. Absolutely no evidence was introduced at trial which tends to show that the strip search, or any portion of it, is selectively enforced in order to harass or reward any DSU or general population inmate, including Arruda. The fact that the strip search policy is implemented more frequently on DSU inmates than general population inmates is explained by the fact that DSU inmates have demonstrated themselves to be more dangerous than general population inmates, and thus deserving of closer scrutiny and supervision by prison officials in order to insure the safety of all members of the institutional community.

*Rulings of Law:*

Plaintiff's legal claim, in short, is that MCI-Walpole's strip search policy, and in particular the visual rectal search aspect of the procedure, as applied to him as a resident of the DSU, is violative of his constitutional rights. Analysis of this claim must begin with the obvious: No constitutional right is in and of itself absolute, and whether the exercise of a recognized right should be accorded judicial protection depends in the end on the extent and importance of the existing, countervailing circumstances that weigh against the protection of that right. It is also axiomatic that despite the fact of their incarceration in penal institutions after being convicted of violating state or federal criminal laws, prisoners are not deprived of all the constitutional rights they otherwise would hold as free citizens. Yet in the prison setting, circumstances exist which are not present in the outside society and which require the limitation and even non-recognition of some constitutional rights. These circumstances include the important societal needs of assuring that persons convicted of crimes are separated from the society which they have acted against, and assuring that they will be detained in a situation that is safe and secure both for the prisoners themselves and those who are charged with the supervision of prisoners. It is only within a safe and secure prison environment that society can ever hope to see the well-recognized goals of criminal punishment achieved. As was recognized by the Honorable Charles Wyzanski of this Court thirteen years ago,

> A prisoner is one whose freedom has been intentionally restricted in the interests of the safety of society, his own reform, and a deterrence of misconduct by him or others. It is not appropriate that he have all the liberties of a free man. Only such liberties are rightfully his as are indispensable to fair and decent treatment, to avoidance of cruel and unusual punishment, and to preclusion of invidious discrimination.

*Nolan v. Scafati,* 306 F.Supp. 1, 3 (D.C. Mass.1969). *See also Bell v. Wolfish,* 441 U.S. 520, 545–46, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979); and *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1059, 92 L.Ed. 1356 (1948).

Thus, in this case the question of whether the search policy here complained of violates Arruda's constitutional rights depends in large part on the role the policy plays in the overall efforts of prison officials to maintain safety and order at MCI-Walpole, and the extent to which those efforts would be hindered if the Court were to order the modification of the strip search policy as it is applied to the inmates of the DSU. The first step in making this determination is recognizing that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell, supra,* 441 U.S. at 547, 99 S.Ct. at 1878. The operation of our correctional facilities is peculiarly within the provinces of the legislative and executive branches of our state and federal government, *Id.* at 547–48, 99 S.Ct. at 1878–79 and in the absence of substantial evidence in the record which shows that prison officials have exaggerated their response to the security needs of a correctional institution, courts should ordinarily defer to the expert judgment of these officials. *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974). *See also Rhodes v. Chapman,* 452 U.S. 337, 349 n.14, 101 S.Ct. 2392, 2400 n.14, 69 L.Ed.2d 59 (1981).

The standard of review which is to be applied to the defendants' decision to implement the strip search policy as part of their larger effort to maintain security on the DSU was set out by the United States Court of Appeals for the First Circuit in *Feeley v. Sampson,* 570 F.2d 364 (1st Cir. 1978). The Court in that case held that such a decision must be upheld unless it is arbitrary, or is rationally unsupportable. *Id.* at 372. "The mere fact that different measures might have worked or might still be workable does not allow a federal court to substitute its judgment for that of prison officials." *O'Brien v. Moriarty,* 489 F.2d 941, 944 (1st Cir. 1974).

With these tenets in mind, I turn to the plaintiff's specific allegation that the visual rectal search portion of the strip search procedure as it has been applied to him as a DSU inmate violates no less than four of his constitutional rights. First, Arruda argues that the visual rectal search is violative of his Fourth Amendment right to be free from "unreasonable" searches, since the search is routinely exercised by officials who do not have probable cause to believe that Arruda is secreting contraband. The Supreme Court has ruled in *Bell v. Wolfish, supra,* that routine visual body cavity searches such as the one complained of here are not *per se* unreasonable, and that the choice by prison officials of cavity inspections for preventing the smuggling of contraband over less intrusive means does not violate an inmate's Fourth Amendment rights as long as it is a rational and a reasonable decision. *Bell, supra,* 441 U.S. at 559–60, 99 S.Ct. at 1884–85. The Court in *Bell* articulated the following test:

> [T]he test of reasonableness under the fourth amendment ... requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. at 1884.

Since visual rectal searches are not *per se* unreasonable, plaintiff's complaint must be that the circumstances of such searches on the DSU render them unreasonable. Plaintiff argues, for instance, that strip searches are executed with much greater frequency with respect to DSU inmates than those of the general population, and in circumstances in which the possibility of the DSU inmate having had contact with outsiders or even other inmates is small. This argument, however, ignores the fact that the residents of the DSU have been determined

to be the most dangerous of any group of inmates within any of the state's correctional facilities. I rule that the heightened dangerousness of the DSU residents wholly justifies the greater frequency with which strip searches are executed on the DSU.

Plaintiff has presented no evidence which tends to prove that the manner in which the strip searches are conducted on the DSU render the search unreasonable. That a DSU resident undergoing a strip search at the conclusion of a visit must expose his buttocks in the direction of the grilled door of the visiting room (which opens into the general hallway of the DSU's lower or upper tiers) is of little consequence in light of the fact that this practice insures that the inspecting officer, who is separated from the DSU resident by a locked grilled door, will not come in contact with the inmate. No other resident is in a position to view the search, and Arruda himself admitted that the only time that more than two officers view the search is when an inmate like himself refuses to submit to a visual rectal search. I rule that this aspect of the search does not render it unreasonable.

Plaintiff testified that some of the officers who were present when the inspections were executed made degrading jokes about him, but no evidence was presented which shows that Arruda or any other DSU resident was ever physically abused during the course of a voluntary search. I rule that verbal taunts of a few officers would not be enough to render the search policy unreasonable, especially since other remedies exist which are less drastic than that of this Court ordering a modification of the search policy. A inmate could, for instance, report the verbal abuses to the official's superior. Other evidence presented at trial (especially evidence concerning the attempts made by prison officials to terminate and prosecute guards who have smuggled contraband into Walpole) leads me to believe that prison officials would make every reasonable effort to see that such verbal abuses are stopped.

Plaintiff argues through his experts that the visual rectal search portion of the strip search cannot be viewed as reasonable or rational because it does not accomplish the intended goal of the search—the detection of contraband. I have already commented on the deficiencies of this reasoning. Plaintiff relies on the facts that a visual rectal search cannot reveal contraband secreted internally in a prisoner's rectal cavity, and that little if any contraband has been discovered as a result of the visual rectal search. Plaintiff's argument fails to account for the deterrent effect that the defendant prison officials claim the visual rectal search works on prisoners who may be subject to it. The fact that little contraband has been discovered as a result of the visual rectal search is as much a testimony to its effectiveness as a deterrent as its ineffectiveness as a discovery tool. *Bell, supra,* at 559, 99 S.Ct. at 1884. Defendants Fair and Ponte both testified that since the regulations regarding strip searches were tightened, the amount of contraband at MCI-Walpole has significantly diminished. As noted above, it is not the role of this Court to second-guess the effective manner in which prison officials have handled one of their most crucial problems.

The plaintiff in his Fourth Amendment argument finally invites the Court to rule that the strip searches which he must undergo before and after trips by him to the prison hospital and law library, and after his visits with his attorney in the lower tier visiting room, are unreasonable. Prison officials have made the determination that DSU residents must be strip searched any time there has been even the potential for contact with anyone other than prison officers. Since there has been no substantial evidence submitted which shows that in implementing this policy, these officials have exaggerated the security needs of the institution, I cannot accept plaintiff's invitation to selectively overrule these officials.

In short, I rule that none of the circumstances surrounding the strip search policy as it is implemented within the DSU render those searches "unreasonable" and thus violative of the Fourth Amendment.

■ Plaintiff's claim that the strip search policy, especially its visual rectal search aspect, violates his Eighth Amendment right to be free of "cruel and unusual punishment" need not long detain us. Plaintiff's theory here is that the strip search policy is implemented not to further the legitimate goals of the prison institution, but rather to distribute punishment beyond that allowed by law to the objects of the strip searches.

The Supreme Court has ruled that in order to avoid running afoul of the Eighth Amendment's prohibition, a prison practice such as the strip search policy must be (1) "rationally related to a legitimate nonpunitive governmental purpose," and (2) not be "excessive in relation to that purpose." *Bell, supra,* at 561, 99 S.Ct. at 1885. "Ensuring security and order at the institution" —the uncontroverted purported goal of the strip search policy in this case—"is a permissible non-punitive objective," *Id.,* and I rule that this policy as it is implemented in the DSU at MCI-Walpole, has not been shown to have been an "excessive" response to its legitimate objective. I accordingly rule that the strip search policy does not violate the plaintiff's rights to be free of cruel and unusual punishment.

■ Plaintiff also claims that the strip search policy as applied to him constitutes a gross and unjustifiable intrusion of his right of privacy under the Constitution, constituting a denial of his due process rights under the Fourteenth Amendment. While the Supreme Court has found an implicit, limited right of privacy in the Bill of Rights, *see e.g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), it is beyond argument that whatever privacy rights a *free* citizen enjoys under the Constitution, those rights are severely diminished when a citizen is committed by law to a penal institution. *Bell, supra,* 441 U.S. at 556–57, 99 S.Ct. at 1883–84. As the United States Court of Appeals for the Seventh Circuit has noted, "[E]ntry into a controlled environment entails a dramatic loss of privacy. Moreover, the justifiable reasons for invading an inmate's privacy are both obvious and easily established." *Bonner v.*

*Coughlin,* 517 F.2d 1311, 1316 (7th Cir. 1975).

Plaintiff's argument here depends on a finding by this Court that "the DSU strip search policy is an ineffective and unnecessary response to an asserted contraband problem." The trial of plaintiff's claim on merits has convinced me, as I have ruled above, that the opposite contention is true. I therefore rule that the strip search policy does not violate the plaintiff's privacy rights, and does not constitute a violation of his right to due process of law.

■ Plaintiff's final argument is that the strip search policy and the manner in which it is conducted interferes with his constitutional right of access to legal representation and the courts. This argument is based on the fact that he, as a DSU inmate, is subjected to a strip search at least once whenever he visits the prison law library and whenever he visits his attorney. Arruda testified that he has foregone visits to the law library and with his attorney as a result of his desire not to be subjected to a strip search.

Whatever rights are held by prisoners in our society, it is clear that "an inmate's right of unfettered access to the courts is as fundamental a right as any other he may hold .... All other rights of an inmate are illusory without it ...." *Adams v. Carlson,* 488 F.2d 619, 630 (7th Cir. 1973). The issue here, however, is whether a legitimate prison security regulation must be struck down or modified because the plaintiff's unwillingness to comply with the procedure results in his electing to forego trips to the. law library and visits with his attorney. I rule that the challenged practice is wholly justified with respect to plaintiff's visits to the prison law library, for testimony at trial—some of which was given by the plaintiff himself—shows that a DSU inmate who visits the law library is likely to come in contact with inmates from the general population. Since the government has demonstrated that the strip search policy is implemented to meet an established security risk presented by DSU inmate visits to the law library, I rule that the policy does

not unconstitutionally infringe on plaintiff's right of access to the library much less to the courts.

Plaintiff also argues that a DSU inmate should not be subjected to a strip search after visiting with his attorney. Prison officials have made the decision not to treat visitations involving lawyers any differently than visitations involving non-lawyers, and I find no compelling reason to require them to alter this procedure. This is not a case of censureship or even intrusive supervision or monitoring by prison officials of inmate-attorney communications. *See Smith v. Robbins*, 454 F.2d 696 (1st Cir. 1972). In fact, evidence introduced at trial through the testimony of Superintendent Ponte suggests that strip searches are executed after DSU resident-attorney visits because of the inability and possible undesirability of requiring the DSU guards to closely monitor the visit at all times. Plaintiff argues that the strip search policy should be altered to allow DSU residents relief from such searches after visitation with attorneys, but prison officials have opted for the reasonable policy of allowing no exception for any category of visitor, including religious and legal, in order to avoid the identification problems that most certainly would arise. It is not within the discretion of this Court to overturn this reasonable decision.

I accordingly rule that to the minimal extent that the strip search policy may burden plaintiff's right of access to the courts, this burden is outweighed by "the legitimate interests of penal administration and the proper regard that judges should give to the expertise and discretionary authority of correctional officials." *Procunier v. Martinez*, 416 U.S. 396, 420, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974).

In summary, I rule that neither the strip search policy in general, nor the visual rectal search aspect of this policy in particular, as implemented on the DSU at MCI-Walpole, violate any of the plaintiff's constitutional rights. Accordingly, plaintiff's claim for relief should be denied, and judgment should enter for both defendants.

Order accordingly.