**Lazaro FERNANDEZ, et al., Plaintiffs**

v.

**Thomas RAPONE, et al., Defendants.**

**Civil A. No. 91–40105–NMG.**

United States District Court,
D. Massachusetts.

May 14, 1996.

Louis M. Ciavarra, Bowditch & Dewey, Worcester, MA, for Lazaro Fernandez, Dario Cifuentes, William J. Bolivar, Diego Alvarez, Richard M. Brooks, Carlos Bernier, Hector Candelario, Orcando Olivares, Victor Riveras, Louis Pichirilo, and Juan Collazo.

Lazaro Fernandez, Gardner, MA, pro se.

Dario Cifuentes, Gardner, MA, pro se.

William J. Bolivar, Gardner, MA, pro se.

Dieso Alvares, Gardner, MA, pro se.

Richard M. Brooks, Gardner, MA, pro se.

Carlos Bernier, Gardner, MA, pro se.

Hector Candelario, Gardner, MA, pro se.

Victor Riveras, Gardner, MA, pro se.

Louis Pichirilo, Gardner, MA, pro se.

Juan Collazo, Gardner, MA, pro se.

Nancy White, Judith Buckley Hayman, Department of Corrections, Boston, MA, for Thomas Rapone, William Coalter, and Gail Jolly.

## MEMORANDUM AND ORDER

GORTON, District Judge.

The above-entitled matter was filed by eleven plaintiffs who are or were at one time inmates at the North Central Correctional Institution at Gardner, Massachusetts ("NCII–Gardner"): Lazaro Fernandez, Dario Cifuentes, William J. Bolivar, Diego Alvares, Richard M. Brooks, Carlos Bernier, Hector Candelario, Orcando Olivares, Victor Riveras, Louis Pichirilo, and Juan Collazo.[1] On July 12, 1991, the plaintiffs filed their Complaint against three defendants: Thomas Rapone ("Rapone"), the Commissioner of the Department of Correction from February 3, 1991 to July 20, 1991, William Coalter ("Coalter"), the Superintendent of NCII–Gardner from March 31, 1991 to July 13, 1991, and Gail Jolly ("Jolly"), the visiting room sergeant at NCII–Gardner.[2] All three defendants are being sued in both their individual and official capacities.

Plaintiffs' Complaint alleges that the defendants are liable, pursuant to 42 U.S.C. § 1983, for subjecting plaintiffs to strip searches, often in the presence of other inmates who were also being searched, in violation of the Fourteenth Amendment. Plaintiffs claim that such searches were conducted without probable cause, that they were subjected to verbal harassment by officers during the searches, and that the rooms where the searches occurred were unclean. Each plaintiff seeks, *inter alia:* 1) a declaratory

---

1. As of July, 1995, only Fernandez and Collazo remained incarcerated at NCII–Gardner; the other plaintiffs had been released. Soon after the pending motion was filed, Fernandez, too, was released from custody.

2. Although the Complaint lists her name as "Gail Jolly," the third defendant's true name is Gloria Pace. For purposes of this memorandum, however, she will be referred to as "Jolly."

judgment that the defendants have violated plaintiffs' Fourteenth Amendment rights, 2) injunctive relief directing defendants to "cease and halt all strip searches, unless the defendants have 'probable cause,'" and 3) compensatory and punitive damages against each defendant in the amount of $50,000. Complaint at 6. On June 22, 1995, the defendants filed the pending motion for summary judgment.

## I. Factual Background

The relevant facts are recited in the light most favorable to the non-moving party. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993). Prisoners at NCII–Gardner who receive visitors are required to be strip searched to ensure, among other things, that no contraband is introduced into the facility.[3] Prison officials conducting the searches direct the inmates to remove their clothes, which are checked for contraband. The officials next conduct a visual body cavity search of the prisoners, who are then allowed to redress. The search of each inmate lasts between three and five minutes, and the inmate is not touched by the officers during the process. The prison's institutional policy states that strip searches "will be conducted in *relative* privacy, usually by two security personnel of the same sex as the person being searched." 103 NCII 506.13 § 2A(2) (emphasis added).

### A. Group searches

From 1986 until the Fall of 1991, inmates at NCII–Gardner received their visitors in an area of the facility known as "Building C." When the inmates' visitors had departed, the inmates were strip searched in two search rooms, as well as the back visiting room and the inmate bathroom near the search rooms.

---

3. "[S]earches are conducted to detect and prevent the introduction of contraband, recover missing or stolen property and to prevent escapes and other disturbances at [NCII]." 103 NCII 506.1

4. Plaintiffs also allege that being exposed to view by "passers by" occasionally occurred, i.e., a door to a Building C search room would be opened by a guard or inmate when, at the same time, a visitor was leaving the visiting area. Only two of the plaintiffs point to specific instances of such occurrences, however. Plaintiff

Plaintiffs Bernier and Pichirilo also allege that searches occasionally were performed in the basement of the building. The search rooms were not visible from the visiting room area, and the bottom part of the window in each room was painted over so that no one could see in or out. Plaintiffs Bernier, Candelario, Cifuentes, Fernandez, Olivares and Pichirilo also state in their affidavits that they have been searched in groups of up to three inmates in a building adjacent to the outside visitor's yard following contact visits in warm weather.

When the searches were conducted in Building C, the plaintiffs often were searched in groups, i.e., in the vicinity of one or more fellow inmates who had also received visitors and were to be searched. Paragraph 10 of the Complaint alleges that prisoners were searched in groups of as many as seven to ten inmates by three to five officers. In an affidavit, lead plaintiff Fernandez suggested that the number of inmates searched at one time has ranged as high as thirty, with an average of between six and ten prisoners being searched by two or three guards. In deposition testimony, Fernandez testified that the number of inmates present during a search averaged between five to eight inmates, with two to three officers present. Fernandez Dep. at 33.[4]

Fernandez testified that he understood that inmates were searched in groups at the end of visiting period to hasten the search process. Fernandez Dep. at 16. Visiting hours at the facility end at 8:45 p.m. and the visiting room officers end their shifts at 9:00 p.m. According to an affidavit submitted by Donald Johnson, the Director of Security at NCII–Gardner:

> Candelario states in his affidavit that on one occasion, "as he was existing one [of the Building C search rooms] and still pulling on his clothes, [his] mother saw [him] still dressed in [his] underwear." Candelario Affidavit at ¶16. The only other specific example of such viewing is alleged by plaintiff Pichirilo, who observed that both his mother and wife had seen him "hurry[ing] out of [a Building C search] room while still getting dressed." Pichirilo Affidavit at ¶18.

[t]he alternative to utilizing the back visiting room [in Building C] would have been to insist that inmates complete their visits in staggered shifts so that there was adequate time to permit one officer to strip search one inmate at a time in one of the two search rooms. It has been my experience that inmates prefer to take full advantage of the visiting period, staying until the end at 8:45 p.m., rather than terminate a visit early so as to be sure to be searched alone in one of the two search rooms. Johnson Affidavit at ¶¶ 15, 16. If an inmate objects to being strip searched in the presence of another inmate, "it has been, and still remains, the policy and practice at NCII for an officer to comply with an inmate's request to be strip searched alone." *Id.* at ¶ 22. Strip searches have not been conducted in Building C since 1991.

In 1991, the prison visiting room was relocated to "Building D." Since that time, prisoners have been strip searched in two new search rooms (one inmate per room) and, when those rooms are occupied, in the area immediately outside of those rooms, the non-contact visiting room, and the inmate bathroom near the search rooms. In their affidavits, plaintiffs assert that the number of inmates being searched at the same time in these various areas in Building D ranges between two and five.

In the affidavits filed in opposition to defendants' motion for summary judgment, each plaintiff alleges that group searches "may lead to [ ] problems between inmates such as altercations and homosexual advances." *E.g.,* Bernier Affidavit at ¶ 14. None of the plaintiffs introduces evidence, however, demonstrating that they personally have experienced an altercation or homosexual advance following a strip search.

The only evidence introduced by plaintiffs demonstrating that any of the defendants were aware of their complaints that they were being searched in groups is submitted by plaintiff Fernandez.[5] In portions of his deposition testimony submitted in opposition to defendants' motion for summary judg-

ment, Fernandez indicated that, while the searches were being conducted in Building C, he once orally complained to defendant Jolly, who responded that plaintiff should raise the issue with Superintendent John Marshall. Fernandez Dep. at 36. Fernandez does not remember, however, if he did raise the issue with the superintendent. *Id.* at 37.

When the site of the searches was changed to Building D, Fernandez again orally complained to defendant Jolly about being searched in groups. *Id.* at 39. The issue of whether the other defendants were aware of plaintiffs' complaints is less clear. When asked whether defendant Rapone knew that plaintiffs were being strip searched in groups, Fernandez merely replied "I would think so." *Id.* at 44–45. Finally, Fernandez "believes" that he once wrote to defendant Coalter regarding the searches, although he could not remember specifics about the letter. *Id.* at 46.

### B. *Verbal taunts*

Plaintiffs also allege that, on several occasions during searches, they were subjected to disparaging comments by officers conducting the searches. Fernandez Affidavit at ¶ 13; Collazo Affidavit at ¶ 12. It is undisputed that none of the three defendants personally made such comments to the plaintiffs. Moreover, Fernandez acknowledges in his deposition testimony that he does not know if any of the three defendants even were aware of the alleged comments. Fernandez Dep. at 60–62. None of the other plaintiffs' filings suggest that any of the three defendants knew of the alleged comments.

### C. *Conditions of search areas*

Fernandez testified that sometimes there is debris on the floor of the search rooms and that "once in a while [the rooms] look like [they haven't] been cleaned." Fernandez Dep. at 70. Among the debris about which he complains are chip bags, cigarette butts,

---

5. Fernandez testified in his deposition that he complained about such searches to the officer(s) who conducted them, but none of the searching officers is named as a defendant in the instant lawsuit.

dust and sand. *Id.*[6] Fernandez cannot recall if he ever complained about the debris, nor does he know if any of the three defendants were aware of it. *Id.* at 67–68. Although the plaintiffs' affidavits indicate that they are concerned that the unclean conditions might result in health problems, both Fernandez and Collazo acknowledge that they have not had any health problems as a result of the searches. Fernandez Deposition at 69; Answers of Fernandez and Collazo to Interrogatory Number 5. Indeed, the only evidence of medical problems arising from the searches is submitted by plaintiff Cifuentes, who claims that cold tile floors in some search areas sometimes aggravates an arthritic condition he has in one foot. Cifuentes Affidavit at ¶ 16.

## II. *Summary Judgment Standard*

Summary judgment shall be rendered where the pleadings, discovery on file and affidavits, if any, show "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view the entire record in the light most favorable to the plaintiffs and indulge all reasonable inferences in their favor. *O'Connor*, 994 F.2d at 907.

With respect to a motion for summary judgment, the burden is on the moving party to show that "there is an absence of evidence to support the non-moving party's case." *FDIC v. Municipality of Ponce*, 904 F.2d 740, 742 (1st Cir.1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986)). If the movant satisfies that burden, it shifts to the nonmoving party to establish the existence of a genuine material issue. *Id.* In deciding whether a factual dispute is genuine, this Court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The nonmovant's assertion of mere allegation or

denial of the pleadings is insufficient on its own to establish a genuine issue of material fact. Fed.R.Civ.P. 56(e).

## III. *Legal Analysis*

 To prevail in an action brought pursuant to 42 U.S.C. § 1983, plaintiffs must demonstrate that they were deprived of a right, privilege, or immunity secured by the constitution or laws of the United States by a person acting under color of law. *E.g., Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir.), *cert. denied*, 502 U.S. 879, 112 S.Ct. 226, 116 L.Ed.2d 183 (1991). Before determining whether or not the plaintiffs in the case at bar were deprived of any rights, it must be recognized that although convicted prisoners "do not forfeit all constitutional protections by reason of their [imprisonment]," *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979), inmates are accorded only those rights that are "not fundamentally inconsistent with the objectives of incarceration." *Hudson v. Palmer*, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984).

 While it must be recognized that "a strip search, by its very nature, constitutes an extreme intrusion upon personal privacy," *Burns v. Loranger*, 907 F.2d 233, 235 & n. 6 (1st Cir.1990), prisoners' rights may be limited or constrained in order to further numerous institutional objectives, primarily prison security. *Hudson*, 468 U.S. at 524, 104 S.Ct. at 3199. As the Supreme Court has observed, "[l]awful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen," *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), a retraction justified by the considerations underlying our penal system. *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1059–60, 92 L.Ed. 1356 (1948).

 In achieving an acceptable balance between the rights of prisoners and prison security, courts prudently are deferential to

---

**6.** In his affidavit, Fernandez refers to one isolated incident when he was searched in the inmate bathroom and the floor was "covered with water and human waste from an overflowing toilet." Fernandez Affidavit at ¶ 16. At his deposition, however, Fernandez stated that on that occasion he was able to stand in a dry area of the floor and that he was unaware how long the floor had been wet. Fernandez Dep. at 73.

the experienced judgment of prison adminis-trators. *See, e.g., Sandin v. Conner,* —— U.S. ——, ——, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995); *Turner v. Safley,* 482 U.S. 78, 85, 107 S.Ct. 2254, 2259-60, 96 L.Ed.2d 64 (1987); *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

■ The plaintiffs' assertion that post-visit strip searches in the absence of probable cause violate their rights under the United States Constitution is untenable. In *Bell,* the Supreme Court rejected a challenge to the practice of requiring strip searches for pre-trial detainees following every contact visit with persons from outside the facility. 441 U.S. at 558-60, 99 S.Ct. at 1884-85. Noting that the Fourth Amendment prohib-its only unreasonable searches, the Court determined that requiring searches following visits, even without probable cause, was not unreasonable. *Id.* at 558-59, 99 S.Ct. at 1884-85. The *Bell* Court also found that strip searches, if reasonably conducted, vio-late neither the Fifth and Fourteenth Amendments nor the Eighth Amendment. *Id.* at 561, 99 S.Ct. at 1885-86.

In *Arruda v. Fair,* 547 F.Supp. 1324, 1334 (D.Mass.1982), the District Court upheld as reasonable strip searches of inmates both before and after trips to the prison hospital and law library, even though the inmates were shackled and accompanied by guards whenever they moved from their cells. *Id.,* *aff'd,* 710 F.2d 886 (1st Cir.), *cert. denied,* 464 U.S. 999, 104 S.Ct. 502, 78 L.Ed.2d 693 (1984). In making that determination, the Court ruled that the Massachusetts strip search policy did not violate the Fourth, Eighth, or Fourteenth Amendments. *Id.* at 1333-35; *see also Langton v. Commissioner of Correction,* 404 Mass. 165, 168, 533 N.E.2d 1375 (1989) (where SJC held that Massachu-setts inmate's federal constitutional rights were not violated by routine strip searches). Accordingly, courts have regularly upheld strip searches as a constitutionally-permissi-ble method of preventing the smuggling of contraband.

Having determined that reasonable post-visit strip searches are constitutional, the issue next confronting this Court is the man-ner in which the searches were conducted. Specifically, the inquiry turns to whether the conduct of the searches in the vicinity of other inmates who are also being searched renders the practice unconstitutional. That issue will be considered in the context of the Fourth and Fourteenth Amendments to the United States Constitution.

### A. The Fourth Amendment

■ The Fourth Amendment to the Unit-ed States Constitution prohibits searches that are unreasonable. In *Bell,* the Supreme Court observed that the determination of whether a challenged search is reasonable requires a balancing of the need for the particular search against the invasion of per-sonal rights caused by that search. 441 U.S. at 559, 99 S.Ct. at 1884-85. Among the factors to be considered in making that de-termination are "the scope of the particular intrusion, the justification for initiating it, and the place in which it is conducted." *Id.*

■ In the instant case, plaintiffs were strip searched following contact visits in or-der to prevent the introduction of contraband into the facility. It is not disputed that the searches were performed by male correction officers out of the view of visitors and/or other staff, and were, of necessity, performed in available areas near the contact visit sites in order to ensure that contraband was not secreted into other areas of the institution. Plaintiffs do not allege that the searches were either routinely or incidentally ob-served by female officers.[7] *See Cookish v. Powell,* 945 F.2d 441, 447 (1st Cir.1991) (ob-servation which is "other than inadvertent, occasional, casual and/or restricted" impli-cates the Fourth Amendment); *Miles v. Bell,* 621 F.Supp. 51, 67 (D.Conn.1985) (in order to show violation of privacy rights, inmates

---

7. As noted *supra,* note 4, plaintiffs Candelario and Pichirilo allege that, on one occasion, they were viewed by their visitors immediately follow-ing their searches. Those isolated incidents ap-parently occurred, however, because each plain-tiff was hurrying out of a search room before he had even finished dressing.

must show that "viewing" occurs on a regular basis).

There are no allegations of physical abuse by the officers, nor were the prisoners touched during the searches, which lasted only minutes. Finally, although each plaintiff declares that no contraband has ever been discovered on his person, that fact may be "more a testament to the effectiveness of the search technique as a deterrent than to any lack of interest [by the] inmate to secrete and import [contraband] when the opportunity arises." *Bell,* 441 U.S. at 559, 99 S.Ct. at 1885.

The defendants maintain, and this Court agrees, that the fact that plaintiffs were often searched in the presence of other inmates being searched does not render the searches unreasonable. A person's expectation of privacy is unquestionably diminished when he is incarcerated. In *Hudson v. Palmer,* for instance, the Supreme Court observed that:

> [a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continued surveillance of inmates and their cells required to ensure institutional security and internal order.

468 U.S. 517, 527–28, 104 S.Ct. 3194, 3201, 82 L.Ed.2d 393 (1984).

Inmates share cells with another prisoner and shower with fellow inmates. Throughout the day, the inmates, "whether dressing, bathing or even defecating," are observed by fellow inmates and male and female correction officers. Defendants' Memorandum at 13. Accordingly, defendants properly maintain that standing naked within the possible view of other inmates for a brief period of time is "hardly shocking or unreasonable in light of the vital security interest [the searches seek] to preserve against the backdrop of day to day prison life." *See id.* at 13–14.

In *Zunker v. Bertrand,* 798 F.Supp. 1365 (E.D.Wis.1992), for example, the District Court held that an inmate's

> privacy interest in not having other inmates view the strip searches [did not outweigh] the security interests of the prison [in performing such searches and,

therefore,] as a matter of law ... even if other inmates observed plaintiff being strip searched, his [Fourth Amendment] constitutional rights were not violated.

*Id.* at 1370; *see also Franklin v. Lockhart,* 883 F.2d 654 (8th Cir.1989) (upholding constitutionality of visual body cavity searches both in hallway within view of inmates in nearby cells and in passageway in groups of four). This conclusion is supported by the fact that it is the policy and practice at the institution for an officer to comply with an inmate's request to be searched alone.

### B. *The Fourteenth Amendment*

■ The Fourteenth Amendment prohibits a State from depriving a person of life, liberty or property without due process of law. U.S. Const. amend. XIV. To demonstrate a substantive due process violation, a plaintiff must show either that 1) a specific liberty or property interest protected by the Fourteenth Amendment has been violated, or 2) the state's conduct "shocks the conscience." *See Brown v. Hot, Sexy and Safer Productions, Inc.,* 68 F.3d 525, 531 (1st Cir. 1995), *cert. denied,* — U.S. —, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996); *Coyne v. City of Somerville,* 972 F.2d 440, 443 (1st Cir. 1992).

■ Liberty interests protected by the Fourteenth Amendment may arise from either the Due Process Clause itself or the laws of the State. *See Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983). The Supreme Court recently has explained that:

> States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*

*Sandin v. Conner,* — U.S. —, —, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995) (emphasis added; internal citations omitted).

■ In the case at bar, it cannot be said that the strip searches described by the plaintiffs impose "atypical and significant hardship" on plaintiffs in relation to the ordinary incidents of prison life. To the contrary, this Court agrees with defendants that strip searches and communal living are "par for the course in prisons." Defendants' Memorandum at 11.

Under the alternative strand of substantive due process theory, a plaintiff must demonstrate that the State's conduct must "shock the conscience." *See Brown,* 68 F.3d at 531. The Supreme Court has observed that the State's conduct must "offend the community's sense of fair play and decency," and must "do more than offend some fastidious squeamishness or private sentimentalism." *Rochin v. California,* 342 U.S. 165, 169, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952) (due process violated where police obtained evidence by involuntarily pumping defendant's stomach). The First Circuit has explained that the threshold for alleging such claims is high, however, see *Brown,* 68 F.3d at 532, and this Court concludes that the case at bar fails to reach that level.

■ Furthermore, plaintiffs' allegations as to occasional degrading remarks made by some officers during a search would not support a finding of a constitutional violation. The First Circuit Court of Appeals has noted that "emotional injury which results solely from verbal harassment ... is generally not sufficient to constitute an invasion of an identified liberty interest." *Pittsley v. Warish,* 927 F.2d 3, 7 (1st Cir.1991). In *Arruda v. Fair,* for example, the plaintiff established that some officers present during strip searches made degrading jokes about him, but failed to present evidence that he ever was physically abused. The Court held that "verbal taunts of a few officers [were not] enough to render the search policy unreasonable." 547 F.Supp. at 1334.

### C. *Supervisory Liability Under § 1983*

■ Defendants' final argument is that they may not be found liable pursuant to § 1983 because they were not personally involved in the alleged violations. Indeed, it is firmly established that supervisory liability under § 1983 may not be predicated upon a theory of *respondeat superior. E.g., Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 562 (1st Cir.1989). A supervisor may be found liable only on the basis of her own acts or omissions, *Febus–Rodriguez v. Betancourt–Lebron,* 14 F.3d 87, 92 (1st Cir.1994), and a plaintiff must show that the supervisor's conduct or inaction "amounted to a reckless or callous indifference to the constitutional rights of others." *Cartagena,* 882 F.2d at 562. An official displays reckless or callous indifference "when it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." *Febus–Rodriguez,* 14 F.3d at 92; *Germany v. Vance,* 868 F.2d 9, 18 (1st Cir.1989). Lastly, there must be an affirmative link between the supervisory official's acts or omissions and the subordinate's violation of plaintiff's constitutional rights. *See Voutour v. Vitale,* 761 F.2d 812, 820 (1st Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986).

■ In the case at bar, it is undisputed that the three defendants did not personally participate in the searches of the plaintiffs or make the alleged derogatory comments. Plaintiff Fernandez testified that he complained orally to Jolly regarding group searches, but is unaware whether she was aware of the alleged harassment or cleanliness issues. There is even less evidence of the other two defendants' knowledge of plaintiffs' complaints. Moreover, even if the defendants had been aware of the issues about which plaintiffs complain, the record is devoid of any evidence that defendants were deliberately indifferent to plaintiffs' constitutional rights.

This Court concludes that plaintiffs' attempt to impose supervisory liability upon the defendants must fail. As evidenced by their responses to interrogatories propounded by the defendants, plaintiffs rely entirely on the fact that the defendants, as the Commissioner of the Department of Correction, the Superintendent of NCII–Gardner, and the Sergeant in charge of the visiting room should know what their employees are doing and are responsible for their actions. For example, plaintiff Collazo was asked to "state

all that [defendant] Rapone did which ... deprived [him] of any rights, privileges or immunities." Collazo's terse answer was "He is the boss." Collazo Interrogatory No. 11. When a similar question was posed to Collazo about defendant Jolly's involvement, plaintiff answered "Sgt. Jolly runs the show and tells all C/Os what to do." *Id.* No. 13. When asked the same question about defendant Coalter, both Collazo and Fernandez answered that the defendant "was the superintendent, therefore, was and is responsible for the acts of his employees." Fernandez Interrogatory No. 12. Those answers indicate an attempt by plaintiffs to impose liability under § 1983 on a theory of *respondeat superior,* an attempt which is unavailing.

## ORDER

For the foregoing reasons, defendants' motion for summary judgment is ALLOWED.

SO ORDERED.